# No. 21-10806

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS,
STATE OF MISSOURI,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas, Case No. 2:21-cv-00067-Z

## EMERGENCY MOTION UNDER CIRCUIT RULE 27.3 FOR
## ADMINISTRATIVE STAY AND FOR STAY PENDING APPEAL

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
BRIAN C. WARD
  *Senior Litigation Counsel*
  U.S. Department of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044
JOSEPH A. DARROW
  *Trial Attorney*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 4

ARGUMENT ................................................................................................... 7

    I.      Defendants are likely to succeed on appeal ...................................... 8

          A. MPP's termination is not reviewable ........................................... 8

          B. Terminating MPP does not violate § 1225 ................................... 12

          C. The Secretary's decision to terminate MPP satisfies the APA..... 15

    II.     The balance of equities strongly favors a stay ................................. 21

CONCLUSION .............................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................. 9, 21

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
715 F.2d 897 (5th Cir. 1983) ......................................................14

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................10

*Cent. & S. W. Servs. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ......................................................22

*Cohen v. United States*,
578 F.3d 1 (D.C. Cir. 2009)................................................... 10, 21

*Crane v. Johnson*,
783 F.3d 244, 247 (5th Cir. 2015) ................................................9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) .............................................................. 9, 18

*Encino Motorcars v. Navarro*,
136 S. Ct. 2117 (2016) ...............................................................18

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................ 3, 15, 17

*F.C.C. v. Prometheus Radio*,
141 S. Ct. 1150 (2021) ...............................................................19

*Gupta v. McGahey*,
709 F.3d 1062 (11th Cir. 2013)...................................................10

*Hamama v. Adducci*,
912 F.3d 869 (6th Cir. 2018).......................................................23

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952) ........................................................................22

*Heckler v. Chaney,*
470 U.S. 821 (1985) ..........................................................................9

*Innovation Law Lab v. McAleenan,*
924 F.3d 503 (9th Cir. 2019) ...................................................... 4, 10

*Jama v. ICE,*
543 U.S. 335 (2005) ..........................................................................8

*Kiobel v. Royal Dutch Petroleum,*
569 U.S. 108 (2013) ........................................................................20

*Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ..........................................................................4

*Lin v. United States,*
690 F. App'x 7 (D.C. Cir. 2017) ......................................................8

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ..........................................................................8

*Loa-Herrera v. Trominski,*
231 F.3d 984 (5th Cir. 2000) ..........................................................13

*Lousiana ex rel. Guste v. Verity,*
853 F.2d 322 (5th Cir. 1988) ..........................................................12

*Matter of E-R-M- & L-R-M-,*
25 I.&N. Dec. 520 (BIA 2011) .....................................................4, 5

*Matter of M-D-C-V-,*
28 I.&N. Dec. 18 (B.I.A. 2020) ......................................................13

*Motor Vehicle Mfrs. v. State Farm,*
463 U.S. 29, 51 (1983)) .............................................................. 18, 19

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014)............................................................11

*Nken v. Holder*,
556 U.S. 418 (2009) .........................................................................7

*Padilla v. ICE*,
953 F.3d 1134 (9th Cir. 2020) ...........................................................14

*Sugar Cane Growers v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)............................................................22

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368, 389 (5th Cir. 2021)......................................................22

*Texas Oil & Gas Ass'n v. EPA*,
161 F.3d 923 (5th Cir. 1998)............................................................19

*Texas v. Equal Emp. Opportunity Comm'n*,
933 F.3d 433 (5th Cir. 2019).............................................................11

*Texas v. U.S.*,
809 F.3d 134 (5th Cir. 2015) ....................................................... 7, 8, 9

*Wolf v. Innovation Law Lab*,
140 S. Ct. 1564 (2020) ......................................................................4

**Statutes**

5 U.S.C. § 701(a)(2)...........................................................................8

5 U.S.C. § 704 .................................................................................10

6 U.S.C. § 202(5) ..............................................................................4

6 U.S.C. § 251 .................................................................................4

8 U.S.C. § 1103(a)(3)..........................................................................4

8 U.S.C. § 1182(d)(5)(A) .............................................................. 12, 13

8 U.S.C. § 1225(b)(1)......................................................................4

8 U.S.C. § 1225(b)(2)(A) ...............................................................11

8 U.S.C. § 1225(b)(2)(C) .............................................................2, 8

8 U.S.C. § 1226(e) .......................................................................13

8 U.S.C. § 1252(f)(1) ...................................................................22

42 U.S.C. § 265 ..............................................................................5

42 U.S.C. § 268 ..............................................................................5

**INTRODUCTION**

This Court should stay, pending completion of appellate proceedings, the district court's extraordinary injunction. That injunction requires the Department of Homeland Security (DHS)—within seven days—to re-implement the Migrant Protection Protocols (MPP), a former government program through which the Secretary of Homeland Security exercised her *discretionary* statutory authority to return certain noncitizens arriving at the southern border to Mexico pending removal proceedings. Because the injunction takes effect at 12:01 a.m. on Saturday, August 21, 2021, the government respectfully requests an administrative stay by Thursday, August 19, so that this Court can consider the stay motion in an orderly manner. The government also respectfully requests, if this Court is inclined to deny the stay or deny the administrative stay, that the Court enter an administrative stay of no fewer than seven days to give the government an opportunity to seek emergency relief from the Supreme Court.

A stay is warranted because the district court's legal and factual conclusions are deeply flawed, and its injunctive remedy is legally improper, profoundly disruptive to foreign policy, and virtually impossible to implement on the required timeline. In January 2019, DHS instituted MPP with policy guidance implementing statutory authority in 8 U.S.C. § 1225(b)(2)(C), providing that the Secretary "*may return*" certain noncitizens "arriving on land ... from a foreign territory contiguous

1

to the United States" "to that territory" pending resolution of their removal proceedings. (emphasis added). Following the change in administration, the acting Secretary temporarily suspended new enrollments in MPP. Following a comprehensive review, on June 1, 2021, the Secretary terminated MPP, finding it unjustified by the resources it required and incompatible with the administration's broader strategy and foreign policy objectives at the time. AR1-7.

Despite the Executive's clear authority to determine immigration policy and § 1225's express commitment of the decision whether to return noncitizens to Mexico to the Secretary's discretion, on August 13, 2021, the district court vacated the Secretary's decision. The court also issued a nationwide, permanent injunction requiring DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens *because of* a lack of detention resources." Op. 52. That injunction is set to take effect at 12:01 a.m. on Saturday, August 21. *Id.* at 53; *see* Fed. R. Civ. P. 6(a)(1).

The district court's order is wrong in multiple respects. Section 1225(b)(2)(C) is *discretionary*: the Secretary *may*—not *must*—return noncitizens to Mexico or Canada. Contrary to the district court's conclusion, nothing in the Immigration and Nationality Act (INA) dictates how that discretion must be exercised, let alone

suggests that it *must* be exercised if DHS cannot detain every noncitizen arriving at the border who is placed in removal proceedings. The district court's contrary conclusion would mean that until MPP was created in 2019, every Administration had been in continuous and systematic violation of the INA since the relevant provisions were enacted in 1996. The district court also erred by finding that the Secretary's decision violated the Administrative Procedure Act (APA). The Secretary issued a thorough, seven-page memo—based on a 691-page administrative record—that reviewed MPP's "mixed effectiveness" and acknowledged the competing policy considerations. The Secretary then forthrightly grounded his decision in a policy choice to devote DHS's scarce resources to pursuing measures that he judged to be more effective and consistent with this Administration's priorities in managing the challenges of regional migration. In finding that comprehensive explanation insufficient, the district court contravened settled APA precedent holding that, when the government changes policy, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

A stay is urgently need because the injunction will impose immediate, substantial harms on the United States by causing operational chaos at the international border. It will also severely interfere in foreign affairs by effectively

3

dictating foreign policy with respect to Mexico and Central American nations. This Court should grant an immediate administrative stay while it receives briefing and considers this stay request, and then stay the district court's injunction pending appellate proceedings. Appellate courts confronting similar injunctive orders have recognized that a stay pending appellate proceedings is warranted. *See Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020); *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

## BACKGROUND

Legal Background. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see*, *e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). For decades, the Executive has exercised that authority through prosecutorial discretion to prioritize which noncitizens to remove and through what type of proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I.&N. Dec. 520, 523 (BIA 2011).

First, Congress has authorized DHS to initiate expedited removal proceedings in 8 U.S.C. § 1225(b)(1) against certain applicants for admission who lack valid entry documents.[1] Alternatively, the Secretary may place a noncitizen seeking

---

[1] References to the Attorney General in § 1225 now mean the Secretary. 6 U.S.C. §§ 251, 552(d).

4

admission into full removal proceedings held before an immigration judge with potential appeal to the Board of Immigration Appeals, § 1229a, if that noncitizen is not "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). The statute leaves to DHS's discretion whether to seek expedited or full removal against noncitizens. *E-R-M-*, 25 I.&N. Dec. at 523. When DHS places noncitizens into proceedings under § 1229a, Congress has provided that, if the noncitizen is "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," the Secretary "may return the alien to that territory pending a proceeding under section 1229a." *Id*. § 1225(b)(2)(C). The statute also authorizes DHS, within certain limits, to choose between detaining applicants for admission pending their removal proceedings and releasing them pending those proceedings. *Id.* §§ 1182(d)(5), 1225(b)(2)(A), 1226(a).

Migrant Protection Protocols. On January 25, 2019, then-Secretary Nielsen instituted MPP, authorizing immigration officers to "exercise[e] [their] prosecutorial discretion regarding whether" to return to Mexico certain classes of noncitizens arriving from Mexico, and providing guidance for making that determination. *See* Administrative Record (AR) 151. Implementing MPP required the assistance of Mexico, which took a variety of steps to assist the United States and the individuals who were returned under the program. AR152-53. In April, 2020, however, immigration proceedings were suspended in light of the COVID-19 pandemic

(including for noncitizens waiting in Mexico under MPP), and DHS's use of MPP dramatically decreased as many noncitizens encountered at the border were instead expelled under 42 U.S.C. §§ 265, 268 based on an order from the CDC. AR3, 6.

On January 21, 2021, the acting Secretary "suspend[ed] new enrollments in [MPP], pending further review of the program." AR581. President Biden subsequently directed DHS "to promptly review and determine whether to terminate or modify [MPP]." Executive Order 14010, 86 Fed. Reg. 8267 (Feb 2, 2021). And on June 1, 2021, the Secretary announced that he was terminating MPP and explained his decision in a lengthy memorandum. AR1-7.

This Lawsuit. On April 13, 2021, the States of Missouri and Texas filed this suit in the Northern District of Texas, seeking injunctive relief. On August 13, following a one-day bench trial, the district court issued a nationwide injunction requiring DHS "to enforce and implement MPP." Op. 52, Dkt. 94 (Ex. A). The court concluded that the case is justiciable (Op. 21-34); that § 1225(b)(2)(C) *mandates* returning noncitizens to Mexico whenever DHS lacks the resources to detain them (Op. 32, 41-44); that the Secretary's decision terminating MPP violated the APA (Op. 31-42); and that a nationwide injunction with monthly reporting requirements, rather than remand without vacatur, was appropriate (Op. 45-52). The court delayed the effective date of its ruling to August 21, 2021. Op. 53. The government promptly

appealed, and the district court subsequently denied the government's request for a stay pending appeal. ECF 100.

**ARGUMENT**

An immediate stay pending appeal is warranted. The government is likely to prevail and will be severely and irreparably harmed without a stay; a stay will not substantially harm Plaintiffs; and the public interest supports a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009). The Court should also grant an administrative stay while it considers this request. At an absolute minimum, the Court should grant an administrative stay to give the government an opportunity to seek emergency relief from the Supreme Court.

## I. Defendants are likely to succeed on appeal.

### A. MPP's termination is not reviewable

The district court erred in holding the Secretary's decision is reviewable. Op. 26-34.

At the outset, the States lack standing to pursue their claims. The district court held that the States are suffering cognizable injuries from the termination of MPP, Op. 49, primarily based on speculation about an increase in "the number of aliens released and paroled" who will seek driver's licenses. *Id.* at 22. But there is no evidence below that either State has issued a single driver's license to any individual who would have been subject to MPP but for its termination, nor did the States

substantiate any other costs directly traceable to MPP's termination. *Cf. Texas v. U.S.*, 809 F.3d 134, 155, 160 (5th Cir. 2015) (driver's license theory of standing requires evidence that the States had "to hire employees, purchase equipment, and obtain office space"). Moreover, the alleged harm is not redressable because MPP did not require that *anyone* be returned, nor could anyone be returned pursuant to MPP without Mexico's agreement. *See Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017) (redressability cannot be shown where relief requires action by "foreign nations not before the court") (collecting cases).

Even if the States had standing, the agency decision is unreviewable. The APA precludes review of certain categories of decisions traditionally regarded as "committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); 5 U.S.C. § 701(a)(2), and the INA similarly prohibits review of any "decision or action" of the Secretary "the authority for which is specified under this subchapter to be in [his] discretion," 8 U.S.C. § 1252(a)(2)(B)(ii). Both of those provisions separately shield from review the Secretary's decision whether to use the contiguous-territory-return authority, which is entirely discretionary: the Secretary "*may* return" certain noncitizens to a contiguous territory. 8 U.S.C. § 1225(b)(2)(C) (emphasis added). Congress's use of the term "may" "connotes discretion." *Jama v. ICE*, 543 U.S. 335, 346 (2005). "[T]he statutory scheme … provides absolutely no guidance as to how that discretion is to be exercised." *Texas v. United States*, 809

F.3d 164, 168 (5th Cir. 2015). Even the district court acknowledged it could not dictate to the Secretary whether to return an individual noncitizen. Op. 51. And for the same reason, the court cannot dictate that the Secretary must "authorize line-level officers to [return noncitizens to Mexico]." *Contra id.*

In addition, whether to use § 1225(b)(2)(C)'s "return" authority in an individual case or class of cases represents an exercise of enforcement discretion, because it involves a "complicated balancing" of factors "peculiarly within [the Executive's] expertise," such as how to best expend limited "agency resources" and whether a "particular enforcement action … fits the agency's overall policies." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The concerns justifying prosecutorial discretion are "greatly magnified in the [immigration] context," *Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015), which implicates the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy," *Arizona v. United States*, 567 U.S. 387, 397 (2012). Here, the Secretary weighed these concerns and determined that other strategies would be more effective and better align with foreign policy goals, AR1-7, and it was improper for the district court to displace his judgment.

The district court concluded that "the decision to terminate MPP 'is more than a non-enforcement policy.'" Op. 31 (quoting *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020)). But decisions on how and where to secure

noncitizens during removal proceedings, and whether to detain them at all, are quintessential enforcement decisions inextricably intertwined with the decision to pursue removal. *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013). And unlike the DACA program at issue in *Regents*, the Secretary's decision not to subject applicants for admission to contiguous-territory return does not itself confer any affirmative legal benefits or status.

The district court also erred in concluding that § 1225(b) provides a standard that the court could apply. Op. 32. In the court's view, because § 1225(b)(2)(A) references detention of noncitizens placed in § 1229a proceedings, "DHS must use its authority to return aliens to Mexico when an influx of aliens exceeds DHS's detention capacity." Op. 32. But that understanding of the statute is patently incorrect, as explained below. *Infra* p. 12.

Finally, the decision to terminate MPP is not a reviewable final agency action, 5 U.S.C. § 704, because it does not determine "rights or obligations" or produce "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The June 2021 memorandum ending MPP, like the January 2019 memorandum establishing "MPP[,] qualifies as a general statement of policy." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019). A "general statement of policy … is not a 'final agency action,' rendering it unreviewable," *Cohen v. United States*, 578 F.3d 1, 6 (D.C. Cir. 2009), *opinion vacated in part on other grounds*, 650 F.3d 717

(D.C. Cir. 2011) (en banc), unless and until it is applied "in a particular situation" to a regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (similar).

**B. Terminating MPP does not violate § 1225.**

The district court acknowledged that "DHS does not have to use [the return] authority." Op. 32. The court nevertheless held that terminating MPP violated § 1225, which provides that certain noncitizens "shall be detained" for removal proceedings. 8 U.S.C. § 1225(b)(2)(A). In the court's view, "where Defendants cannot meet their detention obligations" due to "resource constraints," Op. 44, § 1225(b) "directs DHS ... to return certain aliens to Mexico," Op. 32, so "terminating MPP necessarily leads to the systemic violation of Section 1225 as aliens are released into the United States because Defendants are unable to detain them." Op. 44. That conclusion misconceives the statutory scheme and would upend decades of practice spanning multiple administrations.

To start, the operative complaint challenges the June 1 memorandum, not any policies governing release from detention. *See* ECF 48 ¶¶ 95-141. Even if the court were right that § 1225 mandated detention, nothing in the statute suggests a direct relationship between that purported detention mandate and the return authority, such that the Secretary is *required* to return any noncitizen he fails to detain. The return

11

authority is explicitly discretionary. *Supra* p. 8. Accordingly, a violation of any detention mandate would be just that—a violation of the detention mandate. Plaintiffs cannot bootstrap their objections to DHS's alleged detention practices into a basis for invalidating the Secretary's separate decision whether to continue using his contiguous-territory-return authority.[2]

In any event, § 1225 does *not* mandate universal detention. The INA provides DHS with various options for processing noncitizens beyond discretionary returns or detention. DHS "*may ... in [its] discretion*" release a noncitizen placed in § 1229a proceedings through "parole" "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added); *see* 8 C.F.R. §§ 1.2, 235.3(c). And in certain circumstances, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States may be released on "bond" or "conditional parole," § 1226(a)(2)(A)-(B).

Subject to specific legal constraints, Congress entrusted the decision whether to detain, release, or return a particular noncitizen to the Secretary's discretion by using discretionary language and barring judicial review. 8 U.S.C. § 1182(d)(5)(A)

---

[2] Given Plaintiffs' claims, the administrative record did not contain evidence concerning release practices and policies. The court independently abused its discretion by relying on "evidence outside the administrative record." *Lousiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988).

(Secretary "may … in his discretion parole") ; *id.*, § 1225(b)(2)(C) ("may return"); *Loa-Herrera v. Trominski,* 231 F.3d 984, 991 & n.12 (5th Cir. 2000) ("[Secretary's] discretionary judgment regarding the application of [§ 1226]—including the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is not ... subject to review.") (citing 8 U.S.C. § 1226(e))). The district court's core legal analysis is thus categorically mistaken: the statute does not impose on DHS a binary choice between detention or return to Mexico for noncitizens arriving from Mexico.[3]

Further proof of the error in the district court's detain-or-return reasoning is found in the history of the return provision, and the absurd results that would follow from the court's view. Congress enacted § 1225(b)(2)(C) in 1996, to codify statutory authority for ad hoc returns that the Board had found lacking. *In re M-D-C-V-*, 28 I.&N. Dec. 18, 25-26 & n.10 (B.I.A. 2020). But MPP—and its broad use of return authority—came into existence only in 2019. AR151. By the district court's logic, Op. 32, every presidential administration for the last 25 years has been systematically violating § 1225 by paroling or otherwise releasing millions of inadmissible applicants for admission rather than returning them to Mexico. And

---

[3] The Court's characterization of contiguous return as an alternative to detention under § 1225(b)(1), Op. 32, 41-43, is particularly misguided, as noncitizens in ongoing expedited removal proceedings are not eligible for contiguous return, § 1225(b)(2)(B)(ii).

under the injunction, all future administrations will be required to return all eligible noncitizens arriving from Mexico until the government can detain every applicant for admission—a condition that has never existed. Nothing in the INA remotely supports that extreme result.

The district court compounded its error by concluding that § 1182 does not permit DHS to parole noncitizens "simply because DHS does not have the detention capacity." Op. 43 n.11. The Court lacked jurisdiction to reach that conclusion, *supra* 12-13. Regardless, it is the agency, not the court, that determines what is a "significant public benefit," § 1182(d)(5), that warrants parole, 8 C.F.R. §212.5(b)(5) ("parole" for "significant public benefit" includes "[a]liens whose continued detention is not in the public interest as determined by" relevant officers), and that determination has always encompassed resource constraints, *see Padilla v. Immigr. & Customs Enf't,* 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021) (describing ICE policy allowing parole "in light of available detention resources"); ECF 98-1, ¶¶ 13-14 (same).

## C. The Secretary's decision to terminate MPP satisfies the APA.

The Secretary's decision easily satisfies the APA's "highly deferential" standard, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983), because it is fully explained and supported by the record, acknowledges the agency's change of position, and is within the range of possible options. The

Secretary's 7-page decision articulates a clear connection between terminating MPP and achieving the Administration's objectives to address the root causes of migration, improve regional migration management, and expand bilateral efforts to combat smuggling and trafficking networks. The Secretary described how he considered the relevant information, including the prior administration's assessments of MPP, the effectiveness of related efforts to address challenges, and the resources required to implement the program, concluding that "MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." AR3; *see* 192-203, 426-58, 468-487, 543-50, 589-621, 651-53. He also considered alternatives and the impact of terminating MPP. AR5. Ultimately, the Secretary found that, "on balance, any benefits of maintaining … MPP are far outweighed by the benefits of terminating the program." AR6.

That comprehensive analysis amply satisfies the APA's deferential standard of review: "the new policy is permissible under the statute, [] there are good reasons for it, and [] the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 515-16. To the extent the Secretary reached different conclusions than those set out in prior MPP assessments, he adequately explained why subsequent developments or different foreign-policy priorities warranted changes. Nothing more is required. *Id.*

The district court's contrary ruling is deeply flawed. The court stated that DHS "ignored critical factors," such as prior assessments regarding MPP's goal of encouraging noncitizens without meritorious claims to return home. Op. 35-36. But the memorandum, and lengthy record supporting it, show that the Secretary evaluated all "prior DHS assessments of the program," and "the anticipated benefits and goals articulated at the outset of the program and over [its] course." AR3, *see also* 151, 192-203, 452, 490, 543, 554-56. Rather than ignore "the importance of deterring meritless asylum applications," Op. 36, the Secretary simply exercised his judgment and discretion to address that problem using different policy tools. For example, the Secretary described other "reforms" the Administration is undertaking—including creation of a dedicated docket for certain arriving noncitizens—to improve the processing of asylum applications and "promote compliance and increase appearances throughout proceedings." AR6 (noting "additional anticipated regulatory and policy changes").

The Secretary also noted ways in which MPP had failed to accomplish this particular goal effectively. The Secretary observed that DHS "originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs," but that in fact, "backlogs increased." AR4, *see* AR187, 653. Moreover, the Secretary concluded that the "focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their

proceedings," and the "approximately 44 percent" of "cases completed through the entry of *in absentia* removal orders" raised questions for him "about the design and operation of the program." AR4; *see* AR557-80, 634-38, 660-63. Although MPP was "intended to reduce burdens" on DHS personnel and resources, "the program imposed additional responsibilities that detracted from [DHS's] critically important mission sets." AR4, 452-55, 660-73.

The district court also concluded that the Secretary had failed to consider "warnings by career DHS personnel" that terminating MPP might "lead to a resurgence of illegal aliens attempting to illegally" enter. Op. 37. Again, the record establishes that the Secretary did not ignore that problem; he sought to address it using different strategies that he reasonably believed would "improve border management and reduce migration surges more effectively and more sustainably than MPP." AR5. Moreover, the court's ruling is based entirely on inadmissible hearsay about what prior DHS officials believe other officials *may* have told the presidential transition team. But the transition team is not the agency, and those statements are "not part of the administrative record." Op. 37. n.10. The actual administrative record showed that over a quarter of MPP enrollees were subsequently reencountered attempting to enter—meaning MPP produced, at least in those cases, *additional* border encounters. AR4, 660-73.

The court next stated that DHS had failed to consider the States' "fiscal harm from the termination of MPP." Op. 37. But the States submitted no evidence of additional costs since April 2020, when MPP enrollments significantly declined, or since January 2021, when new enrollments were suspended. AR3. The court's insistence that DHS was required to investigate whether border encounters increased after new enrollments were suspended, *id*., makes little sense given that MPP enrollments declined much earlier due to COVID-19 and Title 42. Regardless, the Secretary *did* consider "the impact such a decision could have on border management and border communities." AR4-5, 582, 680. And the court's conclusion that the Secretary failed to consider State reliance interests, Op. 37-38, is meritless given that the States have no cognizable reliance interest in a *discretionary* program, and did not identify any "substantial," long-held reliance interests they possess. *See Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

The district court also held the Secretary had failed to consider "more limited policies" than terminating MPP, Op. 38, but the Secretary expressly "considered various alternatives, including maintaining the status quo or resuming new enrollments in the program," and concluded that "preserving MPP in this manner" would "be a poor use of [DHS] resources" given the identified defects in the program as it operated. AR5. "DHS was not required … to 'consider all policy alternatives in reaching [its] decision,'" and has "considerable flexibility" when deciding how to

18

"wind-down" a program. *Regents*, 140 S. Ct. at 1914-15 (quoting *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 51 (1983)). The court's conclusion that DHS was required to set out "example" alternative versions of MPP, Op. 38, reflects a misunderstanding of APA review.

The district court also erred by finding that the Secretary acted arbitrarily when he concluded that the high rate of in absentia removal orders under MPP raised concerns about MPP, without definitively establishing that those orders "resulted from aliens abandoning *meritorious* asylum claims." Op. 39-41. But the Secretary reasonably found that MPP did not adequately "ensure that conditions in Mexico enabled migrants to attend their proceedings," which was supported by record evidence showing a substantially lower in absentia rate for non-MPP cases over the same period. AR660-63. The APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies," *F.C.C. v. Prometheus Radio*, 141 S. Ct. 1150, 1160 (2021), and often "the available data does not settle a regulatory issue and the agency must then exercise its judgment." *State Farm*, 463 U.S. at 52. If, as here, "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).[4]

---

[4] The court also ruled it was arbitrary to consider COVID-related immigration court closures because courts had reopened, Op. 41. But infrastructure used for MPP remains shuttered. ECF 98-2, ¶¶ 10-11.

19

Finally, as explained above, the district court's conclusion that DHS failed to consider section 1225(b)'s supposed requirement to return noncitizens that it does not detain, Op. 41-42, is based on an erroneous legal premise. Regardless, the Secretary considered "various options" "at its disposal," "including detention, alternatives to detention, and case management programs" that "have been shown to be successful in promoting compliance with immigration requirements." AR6; *see* 8-146, 560, 563, 569-75, 675-76.

## II.    The balance of equities strongly favors a stay.

The injunction undermines the Executive Branch's constitutional and statutory authority to enforce the immigration laws, and constitutes a major and "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013); *see Arizona*, 567 U.S. at 396 ("Some discretionary decisions [in the enforcement of immigration law] involve policy choices that bear on this Nation's international relations.").

MPP depended on returned individuals being able to reside temporarily in Mexico, which necessitated "close collaboration and negotiation with the Government of Mexico." ECF 64 at 2, ¶ 5. When first implemented, Mexico took "steps critical to [MPP's] functioning," including committing "personnel and infrastructure to receive individuals" and providing essential services. ECF 98-1, ¶ 15. DHS cannot restart MPP without significant cooperation from Mexico. *Id.*

Requiring DHS to re-implement MPP is thus tantamount telling the United States how to conduct its foreign policy, including with respect to delicate and ongoing discussions with Mexico. *Id*. ¶¶ 9-15; ECF 98-3, ¶¶ 7-20. The court's statement that DHS can simply unilaterally reinstitute MPP and send non-Mexican nationals to Mexico without its agreement, Op. 49 n.15, is both astonishing and utterly refuted by the record.

Ordering DHS to immediately "implement MPP," Op. 52, would also cause severe damage to ongoing efforts to manage migration and combat criminal networks by requiring diplomatic and DHS resources be shifted to restarting MPP. AR6. DHS has been in the process of unwinding MPP and its infrastructure for months, and restarting it would "involve significant and complicated burdens on border security personnel and resources," undermining other high-priority efforts and critically important DHS missions. AR2-3, 5-7, 587-88; ECF 64 at 5, ¶ 10-11; ECF 98-1, ¶¶ 15-20. Reinstating MPP would "require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19." ECF 64 at 8-10, ¶¶ 16-18. That undertaking cannot be accomplished in a safe, orderly, and humane manner in a matter of days. And the injunction's requirement that the government build or obtain "sufficient detention capacity to detain all aliens subject to" the district court's extreme view of § 1225(b), and not "releas[e] any aliens *because of* lack of detention resources," Op. 52, would

similarly upend the government's ability to prioritize finite enforcement resources. ECF 98-1, ¶ 5, 9-14.

These extraordinary and unprecedented harms dwarf those of the States, which submitted *no* evidence that they incurred any additional costs after MPP enrollments declined in April 2020 or since new enrollments ended. *Supra* p.7. Without evidence of concrete harm, Plaintiffs cannot even establish Article III standing, much less harm from a stay pending appeal.

A stay pending appeal is thus particularly appropriate, as there is no plausible "way to restore the status quo ante" in seven days, *Sugar Cane Growers v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002), and attempting to do so would cause massive disruption and implicate issues "intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). For similar reasons, even if this Court agreed with the district court that the agency has not adequately considered relevant factors or explained its decision, remand without vacatur and without an injunction would be the only appropriate remedy. *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Id*. Here, "there is a serious possibility that [DHS] will be able to remedy its [supposed APA] failures," *id.*, and

so the district court's mandatory injunction, which causes "serious disruptions," is an abuse of discretion and should be stayed. *See Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *see also* 8 U.S.C. § 1252(f)(1); *Hamama v. Adducci*, 912 F.3d 869, 880 (6th Cir. 2018) (holding § 1252(f)(1) bars such injunctive relief).

## CONCLUSION

The Court should issue an immediate administrative stay, and then stay the district court's injunction pending completion of appellate proceedings. If the Court is inclined to deny the stay or administrative stay, the Court should enter an administrative stay for at least seven days to give the government an opportunity to seek emergency relief from the Supreme Court.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

August 17, 2021

*/s/ Brian C. Ward*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

JOSEPH A. DARROW
*Trial Attorney*

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,200 words. This motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by telephone calls to the clerk's office and to the offices of opposing counsel on August 16 and 17, 2021, advising of the intent to file this emergency motion. I further certify that the facts supporting emergency consideration of this motion are true and complete.

I further certify under 5th Cir. R. 27.4 that Appellees oppose this motion and plan to file a response in opposition.

/s/ Brian C. Ward
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Brian C. Ward
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice