# In the United States Court of Appeals for the Fifth Circuit

---

STATE OF TEXAS, STATE OF MISSOURI,

*Plaintiffs-Appellees*,

*v.*

JOSEPH R. BIDEN, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *ET AL.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

---

## RESPONSE TO EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING APPEAL

---

*COUNSEL LISTED ON INSIDE COVER*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD STONE
Solicitor General
Judd.Stone@oag.texas.gov

BENJAMIN D. WILSON
Deputy Solicitor General

WILLIAM T. THOMPSON
Deputy Chief of Special Litigation

Counsel for Plaintiff-Appellee State of Texas

ERIC SCHMITT
Attorney General of Missouri

Office of the Attorney General
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-1800
Fax: (573) 751-0774

D. JOHN SAUER
Solicitor General
John.Sauer@ago.mo.gov

JESUS A. OSETE
Deputy Solicitor General
Jesus.Osete@ago.mo.gov

Counsel for Plaintiff-Appellee State of Missouri

# Certificate of Interested Persons

No. 21-10806

## State of Texas, State of Missouri,
*Plaintiffs-Appellees,*

*v.*

## Joseph R. Biden, in his official capacity as President of the United States, *et al.*,
*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Judd E. Stone II
Judd E. Stone II

*Counsel of Record for Plaintiffs-Appellees*

i

# TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................i

Table of Contents ...................................................................................ii

Table of Authorities ..............................................................................iii

Introduction ...........................................................................................1

Statement of Facts ..................................................................................2

    I.   The Border Crisis and Its Impact on the States.............................2

    II.  The Migrant Protection Protocols .............................................3

    III. Procedural History...................................................................4

Argument................................................................................................5

    I.   Defendants Are Unlikely to Succeed on the Merits Because They Violated Federal Law................................................................5

        A.  Defendants cannot escape judicial review of their unlawful agency action..................................................................6

        B.  The June 1 Memorandum was arbitrary and capricious.....................10

        C.  The June 1 Memorandum caused systematic violations of Section 1225..................................................................14

    II.  Defendants Cannot Satisfy the Remaining Factors. .................17

        A.  Self-inflicted inconvenience is not irreparable harm. .........17

        B.  The balance of equities and public interest favor enforcing federal law, not implementing an unlawful memorandum. ...............19

Conclusion.............................................................................................20

Certificate of Service.............................................................................22

Certificate of Compliance .....................................................................22

**Cases:**

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ........................................................... 18

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ......................................................... 18

*Arbid v. Holder*,
   700 F.3d 379 (9th Cir. 2012) (per curiam) ........................................8

*Arizona v. United States*,
   567 U.S. 387 (2012) ........................................................................ 12

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ......................................................................9

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .................................................. 8, 9, 10, 13

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................ 14

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ...................................................... 12

*In re GGW Brands, LLC*,
   No. 2:13-bk-15130, 2013 WL 6906375 (Bankr. C.D. Cal. Nov. 15,
   2013) ............................................................................................... 19

*Innovation L. Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) ..........................................................20

*Jama v. ICE*,
   543 U.S. 335 (2005) ..........................................................................9

*Kucana v. Holder*,
   558 U.S. 233 (2010) ..........................................................................8

*League of Women Voters of United States, v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................ 19

*Merchants Fast Motor Lines, Inc. v. ICC*,
   5 F.3d 911 (5th Cir. 1993) .............................................................. 10

*Michigan v. EPA*,
   576 U.S. 788 (1992) ......................................................................... 10

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................12, 13

*Nken v. Holder,*
    556 U.S. 418, 436 (2009) ....................................................20

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ...............................................10

*Texas. v. United States*,
    787 F.3d 733 (5th Cir. 2015) ...............................5, 6, 18, 20

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015).................................................6

*Texas v. United States*,
    809 F.3d 164 (5th Cir. 2015)........................................... 9, 18

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015).....................................6

*United States v. Escobar*,
    No. 2:17-CR-529, 2017 WL 5749620 (S.D. Tex. Nov. 28, 2017)......................... 19

*United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010) ............................................ 12

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) .............................................. 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) .........................................................8

*Wolf v. Innovation L. Lab*,
    140 S. Ct. 1564 (2020)......................................................20

*Wong Wing Hang v. INS*,
    360 F.2d 715 (2d Cir. 1966) ................................................9

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)...........................................................8

**Statutes and Rules:**

5 U.S.C.:
    § 701(a)(2) .........................................................................8
    § 706(2)(A).................................................................. 8, 10
8 U.S.C.:

§ 1182(d)(5)(A) ................................................................15, 16, 17

§ 1225 ....................................................................................*passim*

§ 1225(b)(2)(C).................................................................3, 9, 16

§ 1229a ................................................................................... 3, 9

§ 1252(a)(2)(B)(ii) ............................................................... 7, 8

§ 1225(b)(1)(A)(iii)(I) ..............................................................9

§ 1225(b)(1)(B)(ii) ................................................................ 15

§ 1225(b)(1)(B)(iii)(IV) ........................................................ 15

§ 1225(b)(2)(A).................................................................... 16

§ 1252(a)(2)(B) .........................................................................8

Fed. R. Civ. Proc. 65(a)(2) ............................................................4

8 C.F.R. § 235.3(d) .......................................................................7

Fifth Cir. R. 27.3 ..........................................................................2

## Other Authorities:

Emily Crane, *Mayorkas tells border agents US is 'going to lose': leaked audio*, N.Y. Post (Aug. 13, 2021) ........................................ 1

Emily Green, *The Biden Admin Is Considering Reviving Trump's 'Remain in Mexico' Policy for Migrants*, Vice (Aug. 18, 2021), https://tinyurl.com/3pexcc4f .................................................. 1

U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 12, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ..............................................................................4

11A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed.) .................................................................................... 18

# INTRODUCTION

There is an "unsustainable" crisis on the southern border, one well-recognized by top leadership at DHS.[1] This crisis can be directly traced to DHS's arbitrary and capricious decision to terminate the Migrant Protection Protocols ("MPP")—a decision that the federal government has reportedly been reconsidering for "weeks."[2] And it harms Texas and Missouri in many ways ("Plaintiffs" or the "States")—including increases in various costs that the States cannot avoid.

Defendants ask this Court for an extraordinary stay of the district court's final judgment and injunction issued with a meticulous, 54-page opinion and after a full bench trial, where Defendants were entitled to introduce whatever evidence they chose. The trial court carefully set forth findings of fact and conclusions of law showing Defendants' June 1 Memorandum terminating the MPP was arbitrary and capricious and violated the Immigration and Nationality Act.

The district court got it right, and Defendants are entitled neither to an administrative stay nor to stay the injunction pending appeal. The June 1 Memorandum was arbitrary and capricious for failing to consider benefits of the MPP that DHS had itself previously identified, for arbitrarily considering factors related to the termination of the MPP, and for failing to consider that termination of the MPP leads to violations of DHS's statutory obligation to detain certain aliens entering the United

---

[1] Emily Crane, *Mayorkas tells border agents US is 'going to lose': leaked audio*, N.Y. Post (Aug. 13, 2021), https://tinyurl.com/2z42md96

[2] Emily Green, *The Biden Admin Is Considering Reviving Trump's 'Remain in Mexico' Policy for Migrants*, Vice (Aug. 18, 2021), https://tinyurl.com/3pexcc4f.

States. Viewing the statutory scheme—and DHS's obligation to detain certain aliens—as a whole, the district court also correctly concluded that the June 1 Memorandum caused Defendants to abandon those obligations.

Defendants' complaints of irreparable harm ring hollow. Public reports indicate that they "have privately discussed reviving the Trump-era policy Migrant Protection Protocols (MPP), colloquially known as "Remain in Mexico," in order to manage the number of migrants arriving at the border." Green, *supra* n.2.[3] Any harms Defendants claim to show arise from their decision to violate federal law—and so those harms are of their own making. This Court does not grant a stay under such circumstances, let alone on an emergency basis. *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015). This Court should issue neither an administrative stay nor a stay pending appeal.

## Statement of Facts

## I.   The Border Crisis and Its Impact on the States

In 2018, an immigration surge caused a "humanitarian and border security crisis," with "severe impacts on U.S. border security and immigration operations." Op. 7. Many thousands of migrants came from Central American countries through Mexico and claimed asylum upon arrival. Most of these claims were without merit, as "only 14 percent of aliens who claimed credible fear of persecution or torture were

---

[3] Under Circuit Rule 27.3, Defendants must "[c]ertify that the facts supporting emergency consideration of the motion are true and complete." While Defendants insist that MPP's re-imposition would lead to a litany of irreparable harms, they did not disclose to the Court that they are considering re-implementing it, if true.

granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Id.* Many "simply bec[a]me fugitives" after they "disappeared into the country before a judge denie[d] their claim." *Id.*

This influx of illegal aliens imposes non-recoverable costs on the States, including those associated with providing driver's licenses, public education, and healthcare. *Id.* at 18-19. It also increases law enforcement and correctional costs, the victimization of migrants by human traffickers, and resultant fiscal harms. *Id.* at 20.

## II. The Migrant Protection Protocols

In response, on December 20, 2018, the Trump Administration implemented MPP. *Id.* at 8. Relying on the federal government's authority under 8 U.S.C. § 1225(b)(2)(C), under MPP, DHS began to return to Mexico certain aliens who were not nationals or citizens of Mexico, but who arrived in the United States from Mexico, for the duration of their removal proceedings under 8 U.S.C. § 1229a. *Id.* The same day, the United States obtained Mexico's agreement to permit entry of MPP enrollees back into Mexico. *Id.* The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation . . . will no longer be released into the country," only to "fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." *Id.*

On October 28, 2019, DHS assessed MPP and found "a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP." Op. 10 (quoting AR 683). It

also found that "aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home." *Id.*

## III. Procedural History

On January 20, 2021, the Biden Administration suspended further enrollments in MPP in a three-line memorandum. Enforcement encounters on the southwest border immediately skyrocketed: encounters jumped from 75,000 in January, to 173,000 in April, to nearly 189,000 in June, Op. 17 (citing AR 670), to 212,000 in July. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 12, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. This amplified the ongoing border crisis into an outright disaster, emboldening criminal cartels and human traffickers who prey on vulnerable migrants.

On April 20, Texas and Missouri challenged DHS's suspension of MPP, alleging that the suspension of the program violated the Administrative Procedure Act and the INA, 8 U.S.C § 1225. Op. 1-2. Plaintiffs moved for a preliminary injunction, but before briefing was concluded, DHS issued a new memorandum (the "June 1 Memorandum") that permanently terminated MPP. *Id.* The June 1 Memorandum failed to consider MPP's role in discouraging illegal border crossings, DHS's own favorable 2019 assessment of MPP, the States' reliance interests, or any alternatives less burdensome on the States other than terminating MPP altogether. *Id.* at 36-38.

Plaintiffs promptly amended their complaint to challenge the June 1 Memorandum. *Id.* at 2. The parties agreed to consolidate the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *Id.* at 3. After a bench trial, the district court concluded that Plaintiffs "are entitled to

relief on their APA and statutory claims against Defendants," and vacated the June 1 Memorandum. *Id.* at 1. The district court also "craft[ed] injunctive relief to ensure Plaintiffs receive a full remedy" because an injunction would have "meaningful practical effect independent of . . . vacatur." *Id.* at 1, 51-52 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

## ARGUMENT

The federal government is not entitled to a stay because it cannot satisfy the "four factors [courts consider] in deciding whether to grant a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Texas. v. United States*, 787 F.3d 733, 746-47 (5th Cir. 2015) (cleaned up). "A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* (cleaned up).

## I. Defendants Are Unlikely to Succeed on the Merits Because They Violated Federal Law.

Defendants are not entitled to a stay because they cannot make "a strong showing that [they are] likely to succeed on the merits." *Texas*, 787 F.3d at 746. This "strong showing" requires the government to demonstrate that the district court abused its discretion by entering an injunction. *Id.* at 747. Legal issues are "reviewed *de novo*," but "findings of fact are reviewed for clear error." *Id.* Defendants categorically ignore this deferential standard of review. *Cf.* Mot. 7.

**A. Defendants cannot escape judicial review of their unlawful agency action.**

Defendants provide (at 7-11) a laundry list of reasons for the Court to avoid reaching the merits of Plaintiffs' claims, but the district court correctly rejected each argument. Op. 21-34.

**1. Plaintiffs have standing.**

Defendants' standing argument ignores the district court's fact findings supporting standing. *Compare* Mot. 7-8, *with* Op. 17-20.

Evidence before the district court supports its conclusion that both Texas and Missouri had standing based on costs associated with (1) driver's licenses, (2) education, (3) healthcare, and (4) law enforcement and corrections. Op. 18-20. Defendants mention only one of these: "the driver's-license rationale," which this Court approved in the DAPA case. *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). That ruling compels the conclusion that Plaintiffs have standing here because the relevant evidence in the two cases was indistinguishable. *Compare id.* at 748, *and Texas v. United States*, 86 F. Supp. 3d 591, 616-17 (S.D. Tex. 2015), *with* Op. 18-19, *and* ECF 54-2, Ex. F (App. 425-29). And in any event, Defendants provide no basis for this Court to conclude that the district court clearly erred in these findings.

Defendants dispute redressability (at 8) "because MPP did not require that" any particular alien remain in Mexico. True, MPP gave immigration officers some discretion, but when they exercised that discretion, they ordered more than 68,000 aliens to remain in Mexico, ECF 61 at AR555, including more than 50,000 aliens on the Texas border, ECF 11 at 2. Reinstating MPP would allow immigration officers to

make similar choices, thereby redressing the States' harms stemming from the presence of too many illegal aliens. Op. 23.

Next, Defendants challenge redressability (at 8) on the theory that aliens cannot "be returned pursuant to MPP without Mexico's agreement." But they cite no record evidence for this claim. To the contrary, the record supports the district court's conclusion that the federal government could initiate—and had initiated—MPP unilaterally. Op. 49 n.15 (citing ECF 54-2 at App.303, App.307). As the district court explained, "even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place—before they ever enter the United States." *Id.* To the contrary, DHS's regulations provide that the federal government "may require" any apparently inadmissible alien "who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing." 8 C.F.R. § 235.3(d).

### 2. The June 1 Memorandum is reviewable.

Defendants next insist (at 8-10) that the termination of MPP is unreviewable. Wrong again—for three reasons. *First*, Defendants rely (at 8) on 8 U.S.C. § 1252(a)(2)(B)(ii), but four courts have rejected this argument in cases about MPP. *See* Op. at 29-30 (collecting cases). Defendants cite no precedent showing that a statute barring aliens' challenges to certain "[d]enials of discretionary relief" prevents States from challenging the termination of an entire program. 8 U.S.C. § 1252(a)(2)(B).

Section 1252(a)(2)(B)(ii) prevents aliens from challenging the federal government's refusal to grant discretionary relief "as a matter of grace." *Kucana v. Holder*, 558 U.S. 233, 247-48 (2010); *see* ECF 67 at 17-19. It does not apply when a plaintiff "challenge[s] the extent of the [official's] authority" because "authority is not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Merely labeling a federal official's decision "discretionary" does not "trigger[] § (a)(2)(B)(ii)'s discretionary review bar." *Arbid v. Holder*, 700 F.3d 379, 384 (9th Cir. 2012) (per curiam).

*Second*, Defendants argue (at 8) that terminating MPP was committed to agency discretion by law under 5 U.S.C. § 701(a)(2). This ignores the APA's "basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). "To honor the presumption of review," the Supreme Court has read "§ 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Id.*

Terminating MPP is not one of "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Defendants lack discretion in these circumstances because the June 1 Memorandum violates mandatory duties under Section 1225. *See infra* Part I.C.

Moreover, Defendants conflate the exercise of ordinary discretion—which can be "aside" if "abuse[d]," 5 U.S.C. § 706(2)(A)—with unreviewable agency action "committed to agency discretion by law." *Id.* § 701(a)(2); *see Weyerhaeuser*, 139 S.

Ct. at 370. When Congress wants to grant "sole and unreviewable discretion," it knows how, as it did elsewhere in Section 1225. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). But when Congress grants only ordinary discretion, as through the use of "may" in Section 1225(b)(2)(C), agency action can be set aside "if it [is] made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." *Wong Wing Hang v. INS*, 360 F.2d 715, 718 (2d Cir. 1966). The mere presence of some discretion does not render decisions unreviewable. *E.g.*, *Regents*, 140 S. Ct. at 1905-07 (holding the rescission of DACA was reviewable even though "DHS may rescind DACA"). Even if the statute "leave[s] much to the Secretary's discretion," it "do[es] not leave his discretion unbounded." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).

Defendants' authority (at 8-9) is not to the contrary. Most either rejected their reviewability arguments or did not consider APA reviewability. *Texas*, 809 F.3d at 164, 168; *Jama v. ICE*, 543 U.S. 335, 346 (2005). The remainder address straightforward non-enforcement policies, but the district court correctly found that terminating MPP is more than a non-enforcement policy: by increasing the use of parole, DHS "create[s] affirmative benefits for aliens such as work authorization." Op. at 31. "Moreover, the MPP program is not about enforcement proceedings *at all*" because "[a]ny alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a." *Id.* at 32.

### 3. The June 1 Memorandum is final agency action.

Defendants' remaining argument (at 10-11) that terminating MPP was not final agency action because it did not "produce 'legal consequences'" is equally wrong.

The June 1 Memorandum indisputably "direct[ed] DHS personnel, effective immediately." ECF 61 at AR 007. "That the agency's action binds its staff demonstrates that legal consequences flow from it." *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019). Defendants cannot avoid that conclusion by asserting (at 10-11) that the June 1 Memorandum was a mere policy statement: in this Circuit, a "policy statement" can be "'final agency action' within the meaning of" the APA. *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919-20 (5th Cir. 1993). The district court therefore correctly found the June 1 Memorandum reviewable.

## B.   The June 1 Memorandum was arbitrary and capricious.

The district court correctly found the Memorandum unlawful. "The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Regents*, 140 S. Ct. at 1905 (cleaned up). Among other things, it prohibits agency actions that are arbitrary and capricious, 5 U.S.C. § 706(2)(A), and requires agencies to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 788, 796 (1992).

The district court concluded that the Secretary's June 1 Memorandum was arbitrary and capricious for numerous reasons, including because the agency failed to consider the benefits of MPP, relied on reasons for terminating MPP that were arbitrary, and failed to consider the effect terminating MPP would have on DHS's ability to detain aliens subject to mandatory detention. Op. 34-42. Any of these failures would be fatal to the June 1 Memorandum.

**1. The district court correctly concluded that the June 1 Memorandum improperly failed to consider the MPP's benefits.**

The June 1 Memorandum is unlawful because it failed to consider key parts of the record on MPP. *First*, as DHS concluded in October 2019, asylum applicants "with non-meritorious claims often remain in the country for lengthy periods of time," creating "perverse incentives." Op. 12 (citing AR 687). After implementing the MPP, DHS found "'aliens without meritorious claims—which no longer consti-tute[d] a free ticket into the United States—[were] beginning to voluntarily return home." Op. 36 (citing AR 684). "The June 1 Memorandum never once mentions these benefits." *Id. Second*, "the Secretary failed to consider the warnings by career DHS personnel that 'the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally cross the border.'" *Id.* at 37. *Third*, "[t]he Secretary failed to consider the costs to Plaintiffs and Plaintiffs' reliance interests in the proper enforcement of federal immigration law" and "the ongoing implementation of the MPP." *Id. Fourth*, "the Secretary also failed to mean-ingfully consider more limited policies than the total termination of the MPP." *Id.* at 38.

Defendants insist (at 15) that none of this is right because "the Secretary evalu-ated all 'prior DHS assessments of the program,' and the 'anticipated benefits and goals articulated at the outset of the program and over its course.'" Besides the Sec-retary's *ipse dixit*, the record does not support this claim. The June 1 Memorandum does not show that DHS actually *identified* those benefits, let alone *evaluated* them or *explained* why they are outweighed by MPP's costs. This contravenes the

Supreme Court's instruction that DHS must "supply a reasoned analysis for [its] change" in position. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Defendant's talismanic "stat[ement] that a factor was considered" cannot suffice. *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).

Defendants' four specific objections also lack merit. *First*, Defendants concede (at 7) that the June 1 Memorandum fails to consider warnings by career DHS personnel, complaining that those warnings are not in the administrative record. That is a confession not a defense: if these warnings—credited by the district court—were not in the administrative record, the June 1 Memorandum could not have considered them. Together with the increase in border encounters after MPP's termination, this shows that the June 1 Memorandum unlawfully failed to consider the relevant facts and data. *State Farm*, 463 U.S. at 43.

*Second*, defendants challenge (at 18) as unsupported the conclusion that the June 1 Memorandum failed to consider costs to States. But the Supreme Court has recognized that States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). As discussed above, the record supports the district court's standing finding because costs for States did increase—and again, Defendants have not even attempted to show clear error.

*Third*, Defendants erroneously contend (Mot. 18) that the States have no reliance interests. But this contradicts the Supreme Court's decision in *Regents*, where the Court considered loss of tax revenue to State governments. 140 S. Ct. at 1914.

*Fourth*, Defendants object (at 18-19) to the district court's conclusion that the June 1 Memorandum fails to consider more limited policies than MPP's termination. Defendants attack a straw man, arguing that the district court required DHS to set out examples of alternate versions of the MPP. The district court actually concluded that the agency's cursory analysis meant that it had failed to meaningfully *consider* alternatives, noting that the "entirety of the Secretary's reasoning in not modifying the MPP is contained" in one sentence. Op. 38. The Secretary "should have considered those matters" but did not. *Regents*, 140 S. Ct. 1915.

### 2. The district court correctly concluded that the June 1 Memorandum reached arbitrary conclusions.

The district court also concluded DHS arbitrarily justified terminating MPP based on the "high percentage of cases completed through the entry of *in absentia* removal orders"—specifically, 44%. Op. 38-40 (quoting AR 4). The district court noted two defects in this analysis. *First*, the district court concluded that this analysis reaches no policy conclusion at all. *Id.* at 39 (quoting *State Farm*, 463 U.S. at 52). *Second*, the district court concluded that DHS's own data suggest comparable in absentia removal rates before MPP's implementation. Thus, the June 1 Memorandum did not conclude that 44 percent was a high rate of in absentia removal, whether MPP was the cause, and if so whether that meant the MPP performed as intended. *Id.* at 40-41. The evidence supports each conclusion.

Defendants contend only (at 19) that the Secretary found that the MPP "did not adequately 'ensure that conditions in Mexico enabled migrants to attend their proceedings.'" Even if true, that is beside the point because the June 1 Memorandum

reaches no conclusion concerning that number, only observes that it "raises questions." AR 4. At a minimum, the Secretary needed to explain why his conclusion was contrary to DHS's previous conclusion that MPP caused aliens to abandon meritless asylum claims. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

The district court further concluded that reliance on COVID-19 court closures was arbitrary and capricious because immigration courts reopened before the program was cancelled. Op. 41. Defendants' footnote response states that "infrastructure used for MPP remains shuttered." Mot. 19 n. 4. But the evidence Defendants point to does not suggest that infrastructure remains closed for any reason other than that Defendants themselves have declined to reopen it. *See* ECF 98-2, ¶¶10-11.

**3. The district court correctly concluded that the June 1 Memorandum was arbitrary and capricious because it failed to consider the effect on compliance with section 1225.**

Finally, the district court correctly concluded that the June 1 Memorandum was arbitrary and capricious because it failed to consider DHS's mandatory detention obligations. Op. 41-42. Defendants' primary contention (at 20) that DHS has no mandatory detention obligation contravenes the INA.

**C. The June 1 Memorandum caused systematic violations of Section 1225.**

The district court concluded that, "Section 1225 provides the government two options vis-à-vis aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory"; "[f]ailing to detain or return aliens pending their immigration proceedings violates Section 1225." Op. 43. Because "[u]nder *these particular* circumstances, where Defendants cannot meet their detention obligations, terminating

MPP necessarily leads to the systemic violation of Section 1225." *Id.* at 44. Put simply, "aliens are released into the United States because Defendants are unable to detain them." *Id.* Parole is an alternative, but only on a "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).

Defendants contend (at 11) that the district court "misconceived the statutory scheme." But the district court's ruling follows the plain statutory text. If an alien subject to expedited removal lacks credible fear of persecution, the alien can invoke further administrative proceedings but "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Even if the officer determines that the "alien has a credible fear of persecution . . . the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii).

For aliens not going through expedited removal (that is, aliens given a Notice to Appear), the INA typically mandates detention: "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for" removal proceedings. *Id.* § 1225(b)(2)(A). The INA *does* give the federal government an alternative choice if the alien "is arriving on land . . . from a foreign territory contiguous to the United States"—namely, the government "may return the alien to that territory pending" asylum proceedings. *Id.* § 1225(b)(2)(C). Thus, the government has two options for the default rule governing asylum seekers: (1) detention or (2) return to a contiguous

territory (as required by MPP). What the government *cannot* do is release them into the interior (as required by the June 1 Memorandum).

The States do not, and have never, contended that this scheme mandates MPP. The second option is *optional. See* 8 U.S.C. § 1225(b)(2)(C) (providing that the federal government "may return the alien to that territory"). The federal government can always choose the first option: detention. And the States recognize that Defendants may grant parole, but only "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and not on a class-wide basis. 8 U.S.C. § 1182(d)(5)(A).

But Defendants are not paroling individuals for the reasons specified by statute. Instead, "[t]he number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and not whether the individual circumstances of individual cases warrant release or detention." OP. 43 n.11 (citing AR 184). "DHS has the discretion to parole people who are not eligible for bond and frequently does so due to insufficient detention space or other humanitarian reasons." AR 183. Thus, after a "preliminary finding" of "credible fear," Defendants are "convert[ing]" an alien's status from "Expedited Removal" to "Notice to Appear" and then allowing the alien to be "released on recognizance." ECF 54-2, App.330 n.7.

According to Defendants, the aliens' "[l]egal status while out of custody is parole until asylum is granted." *Id.* They claim to be doing so because "[c]ontinued detention of a migrant who has more likely than not demonstrated credible fear is

not in the interest of resource allocation or justice." *Id.* But this class-based determination is not the "case-by-case" determination required by section 1182(d)(5)(A).

Put differently, the reason there are so many aliens requiring detention (or, purportedly, in need of parole) is Defendants' suspension of MPP. Thus, the district court properly found that Defendants' suspension of MPP is causing their ongoing violation of Section 1225, Op. 42-43, and Defendants cannot show the remaining factor in the stay test—a likelihood of success on the merits.

## II. Defendants Cannot Satisfy the Remaining Factors.

Defendants cannot satisfy the remaining stay factors because whatever harm they may suffer is self-inflicted, and while there is a public interest in enforcing immigration laws, there is neither a public interest in failing to enforce them nor in unlawful agency action.

### A. Self-inflicted inconvenience is not irreparable harm.

The Court considers whether the government will be "irreparably injured absent a stay." *Texas*, 787 F.3d at 746-47. The government merely offers (at 7), in conclusory fashion, that it "will be severely and irreparably harmed without a stay[.]" But such conclusory allegations of irreparable injury are insufficient. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). And it was Plaintiffs—not Defendants—who during trial "show[ed] that they are suffering ongoing and future injuries as a result of the termination of MPP." Ex. [x] at 49.

Defendants counter (at 20-23) that the district court's injunction will be disruptive. The district court rejected such "problems [as] entirely self-inflicted." Op. 46-

47. "That the government's asserted harm is largely self-inflicted 'severely undermines' its claim for equitable relief." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020); *see also* 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.). Defendants "could have avoided" these problems "by delaying preparatory work until the litigation was resolved." Op. 46-47 (quoting *Texas*, 809 F.3d at 187). Or Defendants "'could have avoided' any disruptions by informing Mexico that termination of MPP would be subject to judicial review 'until the litigation was resolved.'" *Id.* at 47 (quoting *Texas*, 809 F.3d at 187). And "Mexico is capable of understanding that [Defendants are] required to follow the laws of the United States which includes the APA and INA." *Id.*

Insofar as Defendants' claim disruption because "MPP had been in the process of termination for *months*[,]" that establishes only that the June 1 Memorandum was a "*post hoc*" rationalization "for a decision that was already made," which does not reflect good faith (and would itself be arbitrary and capricious under the APA). *Id.* at 48. Such inequitable conduct is "sufficient to deny" Defendants' request for an equitable stay pending appeal. *In re GGW Brands, LLC*, No. 2:13-bk-15130, 2013 WL 6906375, at *26-*27 (Bankr. C.D. Cal. Nov. 15, 2013).

Defendants claim (at 20) that they "cannot restart MPP without . . . cooperation from Mexico." Again, "MPP was adopted and launched unilaterally, just as it was later terminated unilaterally." Op. 49 n.15. "And even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place—before they ever enter the United States." *Id.*

### B. The balance of equities and public interest favor enforcing federal law, not implementing an unlawful memorandum.

The district court also correctly found that "Defendants have no 'interest in the perpetuation of unlawful agency action." Op. 50 (quoting *League of Women Voters of United States, v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "Rather, there is a 'public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Moreover, "the public has an 'interest in stemming the flow of illegal immigration.'" *Id.* at 50 (citing *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620 at *2 (S.D. Tex. Nov. 28, 2017)). "And the public has interest in the enforcement of immigration laws, including Section 1225." *Id.* Defendants' arguments to the contrary lack merit.

*First*, Defendants suggest (at 20) that the balance of harms always favors the federal government in immigration cases. Not so. Texas and other States successfully challenged DAPA, and this Court properly refused to stay Judge Hanen's injunction. *See Texas*, 787 F.3d at 769. To be sure, when a federal court prevents the Executive Branch from *enforcing* the nation's immigration laws, a stay may be appropriate. For instance, "[t]here is always a public interest in prompt execution of removal orders." *Nken v. Holder*, 556 U.S. 418, 436 (2009). Thus, courts often stay injunctions that would have prevented the enforcement of immigration restrictions. *See, e.g.*, *Wolf v. Innovation L. Lab*, 140 S. Ct. 1564 (2020); *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). But here, the federal government is violating, not enforcing, federal immigration law. *E.g.* Op. 42-44. "There is always a

public interest in prompt" enforcement of the immigration laws. *Nken*, 556 U.S. at 436. But there is no public interest in abdicating statutory obligations. *See Texas*, 787 F.3d at 768.

*Second*, Defendants suggest that the district court's permanent injunction threatens the separation of powers, but the court simply ordered the relief authorized by Congress. *See, e.g.*, *id.* at 45. In any event, the Executive Branch's "claims that the injunction offends separation of powers" goes to "the resolution of the case on the merits, not whether the injunction is stayed pending appeal." *Texas*, 787 F.3d at 767-68.

## CONCLUSION

The Court should deny Defendants' motion.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Judd E. Stone II
JUDD E. STONE II
Solicitor General
Judd.Stone@oag.texas.gov

BENJAMIN D. WILSON
Deputy Solicitor General

WILLIAM T. THOMPSON
Deputy Chief of Special Litigation

Counsel for Plaintiff-Appellee State of Texas

Eric Schmitt
Attorney General of Missouri

Office of the Attorney General
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-1800
Fax: (573) 751-0774

D. John Sauer
Solicitor General
John.Sauer@ago.mo.gov

Jesus A. Osete
Deputy Solicitor General
Jesus.Osete@ago.mo.gov

Counsel for Plaintiff-Appellee State of Missouri

## Certificate of Service

On August 18, 2021, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Judd E. Stone II
JUDD E. STONE II

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,144 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Judd E. Stone II
JUDD E. STONE II