# No. 21-10806

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS,
STATE OF MISSOURI,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Acting Commissioner, U.S. Customs and Border Protection; UNITED STATES CUSTOMS AND BORDER PROTECTION; TAE D. JOHNSON, Acting Director, U.S. Immigration and Customs Enforcement; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, in her official capacity as Acting Director of the United States Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas, Case No. 2:21-cv-00067-Z

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Acting Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
BRIAN C. WARD
*Senior Litigation Counsel*
JOSEPH A. DARROW
*Trial Attorney*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case.

- State of Missouri (Appellee)
- State of Texas (Appellee)
- Dean Sauer, Office of the Attorney General of Missouri (Counsel for appellee)
- Jesus Osete, Office of the Attorney General of Missouri (Counsel for appellee)
- Lanora Pettit, Office of the Attorney General of Texas (Counsel for appellee)
- Benjamin Wilson, Office of the Attorney General of Texas (Counsel for appellee)
- William Thompson, Office of Attorney General of Texas (Counsel for appellee)
- Judd Stone, Office of the Attorney General of Texas (Counsel for appellee)
- Joseph Biden, President of the United States (Appellant)
- Tae Johnson, Acting Director, U.S. Immigration and Customs Enforcement (Appellant)
- Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security (Appellant)
- Troy Miller, Acting Commissioner, U.S. Customs and Border Protection (Appellant)
- Tracy Renaud, Acting Director, United States Citizenship and Immigration Services (Appellant)
- United States Department of Homeland Security (Appellant)
- United States Citizenship and Immigration Services (Appellant)
- United States Customs and Border Protection (Appellant)
- United States Immigration and Customs Enforcement (Appellant)
- United States of America (Appellant)
- Erez Reuveni, U.S. Department of Justice (Counsel for Appellants)
- Brian Ward, U.S. Department of Justice (Counsel for Appellants)
- Joseph Darrow, U.S. Department of Justice (Counsel for Appellants)
- Brian Stoltz, U.S. Department of Justice (Counsel for Appellants)

- American Civil Liberties Union (Interested Party)
- American Civil Liberties Union of Texas (Interested Party)
- Cody Wofsy, American Civil Liberties Union (Counsel for Interested Party)
- American Immigration Council (Interested Party)
- American Immigration Lawyers Association (Interested Party)
- Catholic Legal Immigration Network (Interested Party)
- Center for Gender & Refugee Studies (Interested Party)
- Human Rights First (Interested Party)
- Justice Action Center (Interested Party)
- National Immigration Law Center (Interested Party)
- Round Table of Former Immigration Judges (Interested Party)
- Southern Poverty Law Center (Interested Party)
- Blaine Bookey, UC Hastings College of the Law, San Francisco, CA (Counsel for Interested Party)
- States of Alabama, Arizona, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Ohio, Oklahoma, South Carolina, and West Virginia (Interested Parties)
- Thomas Fisher, Office of the Attorney General of Indiana (Counsel for Interested Parties)

*/s/ Brian C. Ward*
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument in this case of national importance. Oral argument will help set out the parties' positions and may aid the Court in reaching a decision.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. v

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION.............................................................. 5

STATEMENT OF THE ISSUES.................................................................. 5

STATEMENT OF THE CASE ..................................................................... 6

    I.   Legal background ............................................................... 6

    II.  Migrant Protection Protocols ............................................ 7

    III. Procedural background...................................................... 8

SUMMARY OF THE ARGUMENT ............................................................ 9

STANDARD OF REVIEW ......................................................................... 12

ARGUMENT ............................................................................................... 12

    I.  The States Lack Standing .................................................. 12

    II.  The Secretary's Decision is Not Subject to Judicial Review ............... 23

    III. The Secretary's Decision Does Not Cause DHS to Violate Section 1225 ............................................................ 31

    IV. The Secretary's Decision Satisfies the APA ....................... 41

    V.  Equitable Factors Do Not Support An Injunction.............. 52

CONCLUSION ........................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. United States NRC*,
988 F.2d 146 (1993)......................................................................................51

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................... 24, 47, 52

*Arpaio v. Obama*,
27 F. Supp. 3d 185 (D.D.C. 2014)..............................................................21

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015).......................................... 14, 15, 20, 21

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
715 F.2d 897 (5th Cir. 1983) ....................................................................40

*Bennett v. Spear*,
520 U.S. 154, 175-76 (1997) ........................................................ 26, 28

*Cent. & S. W. Servs. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ....................................................................51

*Clapper v. Amnesty Int'l*,
568 U.S. 398, 414 (2013)................................................................ 14, 20

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388, 399 (1987)...........................................................................26

*Cohen v. United States*,
578 F.3d 1 (D.C. Cir. 2009)........................................................................28

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ........................................................ 15, 16, 23

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018).............................................................35

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
 140 S. Ct. 1891 (2020) ................................................................ passim

*Encino Motorcars v. Navarro*,
 136 S. Ct. 2117 (2016) ........................................................................46

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ...................................................................... 11, 42

*FCC v. Prometheus Radio Project*,
 141 S. Ct. 1150 (2021) ................................................................... 41, 50

*Fed'n for Am. Immigration Reform v. Reno*,
 93 F.3d 897 (D.C. Cir. 1996) ..............................................................27

*FERC v. Electric Power Supply Ass'n*,
 577 U.S. 260 (2016) ............................................................................42

*Fla. Power & Light Co. v. Lorion*,
 470 U.S. 729 (1973) ............................................................................44

*Gayle v. Warden Monmouth Cty. Corr. Institution*,
 2021 WL 4006189 (3d Cir. 2021) .......................................................37

*Gonzalez v. ICE*,
 975 F.3d 788 (9th Cir. 2020) ..............................................................39

*Gupta v. McGahey*,
 709 F.3d 1062 (11th Cir. 2013) ..........................................................24

*Hamama v. Adducci*,
 912 F.3d 869 (6th Cir. 2018) ......................................................... 38, 39

*Harisiades v. Shaughnessy*,
 342 U.S. 580 (1952) ............................................................................54

*Heckler v. Chaney*,
 470 U.S. 821 (1985) ...................................................................... 23, 24

*I.N.S. v. Legalization Assistance Project*,
510 U.S. 1301 (1993)..............................................................27

*In re M-S-*,
27 I. & N. Dec. 509 (A.G. 2019) ..........................................34

*Innovation Law Lab v. McAleenan*,
924 F.3d 503 (9th Cir. 2019) ............................... 18, 28, 29

*Jama v. ICE*,
543 U.S. 335 (2005)...............................................................23

*Kiobel v. Royal Dutch Petroleum*,
569 U.S. 108 (2013).................................................................52

*Knauff v. Shaughnessy*,
338 U.S. 537 (1950).................................................................6

*Lin v. United States*,
690 F. App'x 7 (D.C. Cir. 2017)..........................................22

*Lincoln v. Vigil*,
508 U.S. 182 (1993)............................................. 22, 23, 24, 26

*Linda R.S. v. Richard D.*,
410 U.S. 614, 619 (1973).......................................................27

*Loa-Herrera v. Trominski*,
231 F.3d 984 (5th Cir. 2000) ...............................................33

*Los Angeles v. Lyons*,
461 U.S. 95 (1983)..................................................................20

*Louisiana ex rel. Guste v. Verity*,
853 F.2d 322 (5th Cir. 1988) ...............................................32

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................... 14, 16

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007) ...................................................................................18

*Matter of E-R-M- & L-R-M-*,
25 I.&N. Dec. 520 (BIA 2011) .....................................................................6

*Matter of M-D-C-V-*,
28 I.&N. Dec. 18 (B.I.A. 2020) ..................................................................33

*Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*,
602 F.3d 687 (5th Cir. 2010) ......................................................................44

*Merchs. Fast Motor Lines, Inc. v. ICC*,
5 F.3d 911 (5th Cir. 1993) ..........................................................................28

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010).....................................................................................55

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................... 42, 48, 50

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
416 U.S. 267 (1974).....................................................................................47

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014).....................................................................29

*Nielsen v. Preap*,
139 S. Ct. 954 (2019)............................................................................ 37, 38

*Nken v. Holder*,
556 U.S. 418 (2009).....................................................................................39

*Padilla v. ICE,*
953 F.3d 1134 (9th Cir. 2020) .....................................................................34

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976).....................................................................................21

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) .................................................................................47

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ................................................... 27, 37, 52

*Ring Precisions, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) .................................................46

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ...............................................................54

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .................................................16

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................15

*Sure-Tan, Inc. v. NLRB*,
  457 U.S. 883 (1984) ...............................................................27

*Syncor Int'l Corp. v. Shalala*,
  127 F.3d 90 (D.C. Cir. 1997) ................................... 28, 29, 30

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) .................................................51

*Texas Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ................................... 12, 13

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) .................................................50

*Texas v. Biden*,
  No. 21-10806, 2021 WL 3674780 (5th Cir. Aug. 19, 2021) ........................ passim

*Texas. v. W. Pub. Co.*,
  882 F.2d 171 (5th Cir. 1989) .................................................31

*Texas v. California*,
141 S. Ct. 2104 (2021) ................................................................14

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) ............................................. 29, 30

*Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) ........................................................16

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ................................................ passim

*Texas v. United States*,
No. 21-40618, 2021 WL 4188102 (5th Cir. Sept. 15, 2021) .................. 26, 33, 52

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005)................................................................32

*United States v. Penn. Indus. Chem. Corp.*,
411 U.S. 655 (1973)................................................................47

*Zadvydas v. Davis*,
533 U.S. 678 (2001)................................................................23

**Statutes**

5 U.S.C. § 701(a) ................................................................26

5 U.S.C. § 701(a)(2)................................................................22

6 U.S.C. § 202(5) ................................................................. 2, 6, 24

6 U.S.C. § 251 ................................................................6

8 U.S.C. § 1103 ................................................................ 6, 24, 34

8 U.S.C. § 1182(d)(5)(A)................................................................ 30, 32, 33, 34

8 U.S.C. § 1221................................................................36

8 U.S.C. § 1225 ...................................................................... passim

8 U.S.C. § 1225(b)(1)....................................................................6

8 U.S.C. § 1225(b)(2)(C) ...................................................... 2, 7, 23

8 U.S.C. § 1226(e) ................................................................. 27, 33

8 U.S.C. § 1229a ..........................................................................6, 7

8 U.S.C. §1252(f)(1) ........................................................ 3, 10, 36, 37

28 U.S.C. § 1292(a)(1)..................................................................5

28 U.S.C. § 1331 ............................................................................4

42 U.S.C. § 265 ...........................................................................7

## Regulations

8 C.F.R. § 212.5(b) ................................................................. 32, 34

## INTRODUCTION

The extraordinary permanent injunction issued by the district court in this case threatens to profoundly disrupt the government's management of border security and foreign policy—two areas that the Supreme Court has recognized are committed to the discretion of the Executive Branch. The injunction requires the Department of Homeland Security (DHS) to re-implement the Migrant Protection Protocols (MPP), a terminated government program that relied on the Secretary of Homeland Security's discretionary statutory authority to return certain noncitizens arriving at the southern border to Mexico pending removal proceedings. Even if that were all the court's order did, it would be astounding. The court cited no precedent for the proposition that it has authority to *require* the government to maintain a discretionary immigration-enforcement program and send noncitizens across the border into a sovereign foreign nation. But the district court's order went much further: it held not only that the government had failed to adequately justify rescinding MPP, but that the government must maintain MPP until the agency has sufficient capacity to detain hundreds of thousands of noncitizens arriving at the southern border and millions of noncitizens unlawfully present inside the country. That is to say, the government must keep MPP in perpetuity, given the reality of congressional appropriations. The district court's factual conclusions are

unsupported, its legal conclusions are unprecedented and incorrect, and its injunctive remedy is improper.

In January 2019, DHS instituted MPP pursuant to 8 U.S.C. § 1225(b)(2)(C), which provides that the Secretary "*may* return" certain noncitizens "arriving on land ... from a foreign territory contiguous to the United States ... to that territory" pending resolution of their removal proceedings. (Emphasis added). Following the change in administration, the Acting Secretary temporarily suspended new enrollments in MPP. Then, after a comprehensive review, on June 1, 2021, the Secretary terminated MPP in a seven-page decision memorandum which explained his findings that the significant resources required to implement MPP would be better directed to other immigration-enforcement initiatives, and that the program was incompatible with the administration's border-management strategy and foreign-policy objectives at the time. ROA.1684-90.

Despite the Executive's clear authority to establish "national immigration enforcement policies," 6 U.S.C. § 202(5), and Section 1225's express commitment to the Secretary of the discretionary decision whether to return certain noncitizens arriving at the border to Mexico, the district court vacated the Secretary's decision on August 13, 2021. The court also issued a nationwide, permanent injunction requiring DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as

the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens *because of* a lack of detention resources." ROA.2970.

The district court's order is wrong in multiple respects. Most problematic of all, the court held that Section 1225 *requires* the Secretary to use MPP as long as DHS lacks sufficient detention capacity to detain all noncitizens arriving at the border without entitlement to admission and the millions more living inside the United States who were never admitted. But Section 1225(b)(2)(C) by its own terms is *discretionary*: the Secretary *may*—not *must*—return certain noncitizens to Mexico. Nothing in the Immigration and Nationality Act (INA) dictates how or when that discretion should be exercised, let alone suggests that it *must* be exercised if DHS cannot detain every noncitizen potentially subject to Section 1225 (which has never been possible since Section 1225's enactment). The district court additionally failed to see that, because *Congress* controls DHS's appropriations and has never funded DHS adequately to detain all persons subject to Section 1225, DHS's inability to detain all of those persons cannot, as the court thought, be a violation of Congress's instructions in Section 1225. What is more, Congress specifically barred courts from entering injunctions restraining the Secretary's discretion under Section 1225. *See* 8 U.S.C. § 1252(f)(1).

The district court also erred by finding that the Secretary's decision violated the Administrative Procedure Act (APA). The Secretary issued a termination memorandum supported by a 691-page administrative record that noted MPP's "mixed effectiveness," acknowledged competing policy considerations, and elected to devote DHS's scarce resources and diplomatic efforts to more effective measures that are better in keeping with this Administration's priorities and policy preferences for managing regional migration.

This Court should reverse the district court's decision. Even if the memorandum had violated the APA, the appropriate remedy would have been to remand the decision to the agency without vacatur, so that DHS could issue a new decision. Instead, the district court issued a permanent injunction that imposes substantial harms on the United States, improperly dictates foreign policy with Mexico in ways that severely interfere with the Executive's foreign affairs powers., and effectively prevents the Secretary from ever exercising his discretion to end MPP even through a new decision that indisputably satisfies the requirements of the APA. At an absolute minimum, the Court should vacate the portion of the injunction requiring DHS to continue MPP until it "has sufficient detention capacity to detain all aliens subject to … Section [1225] without releasing any aliens *because of* a lack of detention resources," and the associated onerous monthly reporting requirements. ROA.2970. The district court may not arrogate to itself supervision of the

government's foreign policy negotiations and programmatic oversight of detention, parole, and return of noncitizens arriving at the border.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361, and 2201(a). ROA.1029.

On August 13, 2021, the district court issued an order permanently enjoining the June 1, 2021 Memorandum terminating MPP. ROA.2970. The court rejected the government's multiple arguments that it lacked jurisdiction to consider Plaintiffs' claims and to issue the relief they requested. The government filed a timely notice of appeal from that order. ROA.2973; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

I.    Whether Plaintiffs have standing to challenge the termination of MPP, and whether the termination is reviewable.

II.    Whether the district court erred in concluding that terminating MPP causes DHS to violate Section 1225 and that Section 1252(f)(1) did not foreclose injunctive relief related to Section 1225.

III.    Whether the district court erred in concluding that the June 1 Memorandum terminating MPP violated the APA and that vacatur was the appropriate remedy.

IV. Whether the injunction was improper in light of equitable considerations governing injunctive relief.

**STATEMENT OF THE CASE**

## I. Legal background

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see*, *e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). For decades, the Executive has exercised that authority through discretionary determinations about which noncitizens to prioritize for removal and through what type of proceedings.

Congress has provided DHS with various overlapping tools, including authority in 8 U.S.C. § 1225(b)(1) to initiate expedited removal proceedings against certain applicants for admission.[1] The Secretary may also place a noncitizen seeking admission into full removal proceedings held before an immigration judge under 8 U.S.C. § 1229a if the noncitizen is not "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). The statute leaves to DHS's discretion whether to use expedited or full removal proceedings for noncitizens eligible for both. *See Matter of E-R-M- & L-R-M-*, 25 I.&N. Dec. 520, 523 (BIA 2011). When DHS

---

[1] References to the Attorney General in § 1225 now mean the Secretary. 6 U.S.C. §§ 251, 552(d).

places certain noncitizens into proceedings under Section 1229a, Congress has provided that, if the noncitizen is "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," the Secretary "may return the alien to that territory pending a proceeding under section 1229a." 8 U.S.C. § 1225(b)(2)(C). The statute also authorizes DHS, within certain limits, to choose between detaining and releasing applicants for admission pending their removal proceedings. *Id.* §§ 1182(d)(5), 1225(b)(2)(A), 1226(a).

## II.    Migrant Protection Protocols

On January 25, 2019, then-Secretary Nielsen instituted MPP, authorizing immigration officers to "exercis[e] [their] prosecutorial discretion regarding whether" to return to Mexico certain classes of noncitizens arriving from Mexico, and providing guidance for making that determination. *See* ROA.1834-36. Implementing MPP required the cooperation of Mexico, which took a variety of steps to assist the United States and made certain commitments to support individuals who were returned under the program. *Id.* In March 2020, however, most removal proceedings were suspended in light of the COVID-19 pandemic (including for noncitizens waiting in Mexico under MPP), and new enrollments in MPP dramatically decreased as many noncitizens encountered at the border were instead expelled under Title 42, *see* 42 U.S.C. §§ 265, 268, based on an order from the Centers for Disease Control and Prevention (CDC). ROA.1686, 1689.

On January 21, 2021, the Acting Secretary "suspend[ed] new enrollments in [MPP], pending further review of the program." ROA.2264. President Biden subsequently directed DHS "to promptly review and determine whether to terminate or modify [MPP]." Executive Order 14010, 86 Fed. Reg. 8267 (Feb 5, 2021). On June 1, 2021, the Secretary issued a memorandum terminating MPP. ROA.1684-90.

### III.    Procedural background

On April 13, 2021, the States of Missouri and Texas filed this suit in the Northern District of Texas, seeking injunctive relief. On August 13, 2021, following a one-day bench trial, the district court issued a nationwide injunction requiring DHS "to enforce and implement MPP." ROA.2970. The court concluded that the case is justiciable, ROA.2939-52; that the Secretary's decision terminating MPP violated the APA, ROA.2952-60; that Section 1225(b)(2)(C) *mandates* returning noncitizens to Mexico whenever DHS lacks the resources to detain them, ROA.2960-62; and that a nationwide injunction with monthly reporting requirements, rather than remand without vacatur, was appropriate, ROA.2963-71. The court's nationwide injunction requires DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens *because of* a lack of detention resources." ROA.2970.

The government promptly appealed and sought a stay pending appeal. The motions panel denied a stay, but clarified that DHS is not required to detain every noncitizen subject to Section 1225, and instead cannot "simply release every alien described in § 1225 *en masse* into the United States." *Texas v. Biden*, No. 21-10806, 2021 WL 3674780, at *13-14 (5th Cir. Aug. 19, 2021). The Supreme Court also denied a stay pending appeal, but it endorsed the motions panel's construction of the injunction. *Biden v. Texas*, No. 21A21 (S. Ct. Aug. 24, 2021). The government is now working in good faith to re-implement MPP and obtain the required cooperation from Mexico.[2]

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's decision and vacate the permanent injunction. The district court's order is wrong in multiple respects.

First, the States lack standing to challenge the termination of MPP because they put forth no evidence of any concrete injury that results from ending MPP. The termination of MPP is also unreviewable for several reasons: the decision whether to use the statutory authority to return noncitizens to a contiguous territory is committed to agency discretion; the June 1 Memorandum is not a reviewable final

---

[2] DHS has authorized us to report that the Secretary is reviewing the June 1 Memorandum and evaluating policy options regarding MPP. The result of that review could have an impact on this appeal.

agency action; and States are not within the zone of interests of Section 1225(b)(2)(C).

Second, even if Plaintiffs' claims were justiciable, the district court erred by ruling that Section 1225 requires the Secretary to use MPP. Section 1225(b)(2)(C) is *discretionary*: it expressly provides that the Secretary *may*—not *must*—return noncitizens to Mexico or Canada. Contrary to the district court's conclusion, nothing in the INA dictates how that discretion should be exercised, let alone suggests that it *must* be exercised if DHS cannot detain every noncitizen subject to Section 1225. The district court's contrary conclusion would mean that until MPP was first created in 2019, every Administration had been in continuous and systematic violation of the INA since the relevant statutory provisions were enacted in 1996. The district court's order rewrites Section 1225 to impose requirements that do not exist in the statute and permanently enjoins the government to comply with those novel, unwritten requirements. Congress specifically barred courts from entering injunctions restraining the discretion Congress left to the Secretary under Section 1225. *See* 8 U.S.C. §1252(f)(1).

Third, the district court is wrong that the Secretary's decision violated the APA. The Secretary issued a thorough memorandum backed by an extensive administrative record that detailed MPP's "mixed effectiveness" and acknowledged the competing policy considerations. The Secretary forthrightly grounded his

decision in a policy choice to devote DHS's scarce resources to pursuing other measures that he judged to be more effective and consistent with this Administration's priorities in managing the challenges of regional migration. In finding that comprehensive explanation insufficient, the district court contravened settled APA precedent holding that, when the government changes policy, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And even were this Court to credit any of the district court's criticisms of the memorandum, the appropriate remedy should have been, at most, a remand to the agency without vacatur of the memorandum, to permit a new decision with additional explanation.

Finally, equitable considerations governing injunctive relief do not support a permanent injunction that imposes substantial harms on the United States and severely interferes in foreign affairs by effectively dictating foreign policy with Mexico, especially where the States presented no concrete evidence of actual or imminent harm. At a minimum, the Court should vacate the portion of the injunction requiring the government to maintain MPP until such time as it can detain all noncitizens arriving on the southern border, as well as millions of noncitizens unlawfully present in the United States, which is no different than an order to maintain MPP in perpetuity.

# STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews the district court's findings of fact for clear error and its conclusions of law de novo. *Hobbs v. EVO Inc.*, 7 F.4th 241, 247 (5th Cir. 2021). Although the motions panel addressed the issues on appeal, "under [this] circuit's procedures, opinions and orders of a panel with initial responsibility for resolving motions filed in an appeal are not binding on the later panel that is assigned the appeal for resolution." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020).

# ARGUMENT

## I.     The States Lack Standing.

Plaintiffs lack standing to pursue their claims. The district court held that the States were suffering injuries from the termination of MPP based on speculation about an increase in the number of noncitizens released and paroled, and hypothetical costs the States might incur if these individuals settle in Texas or Missouri and seek State services or benefits, primarily driver's licenses. But these injuries are entirely speculative. There is no evidence that either State has issued a single driver's license to anyone who would have been subject to MPP but for its termination, nor did the States substantiate any other costs traceable to MPP's termination.

The district court's conclusion that "the termination of MPP necessarily increases the number of aliens released and paroled into … the Plaintiff States,"

ROA.2940, is not supported by the record. The court cited no record evidence demonstrating that terminating MPP in fact led to an increase in the number of noncitizens released. *See* ROA.2935, 2960. Instead, the district court found that "termination of MPP has contributed to the current border surge," asserting that "DHS previously acknowledged that 'MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico.'" ROA.2935 (citing ROA.2238). But the cited document merely set out a proposed metric for measuring DHS's goals for MPP. ROA.2238. The actual text says: "**Metric:** MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." *Id*. And the data shows only that border encounters fluctuated over time. As the Secretary explained, "border encounters increased during certain periods and decreased during others" while MPP was in place, and "more than one-quarter of individuals enrolled in MPP were subsequently reencountered attempting to enter the United States," undermining the conclusion that MPP discouraged individuals from trying to reach the border. ROA.1686-87; *see* ROA.2343-56.

The district court next stated that "[s]ince MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed," and "Defendants' data shows encounters jumping from 75,000 in January 2021, when MPP was suspended, to about 173,000 in April 2021." ROA.2935. But encounter

numbers are not equivalent to the number of people arriving because one person may attempt to enter multiple times, leading to multiple encounters. Moreover, the same data the district court cited similarly shows encounters jumped from 58,000 in January 2019, when MPP first took effect, to 144,000 in May 2019, while MPP was still in effect. ROA.2352.[3]

The reality is that migration patterns are affected by a range of factors and difficult to predict. An increase in encounters cannot be traced to terminating MPP where the "record reveals only speculation about the complex decisions made by non-citizens … before they risked life and limb to come here," *Arpaio v. Obama*, 797 F.3d 11, 20-21 (D.C. Cir. 2015). Where "a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'" *Texas v. California*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)); *see Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) (rejecting "standing theories that require guesswork" or "that rest on speculation about the decisions of independent actors").

---

[3] MPP enrollments also declined significantly in April 2020, after the CDC's Title 42 order went into effect, making any connection between the suspension of MPP enrollments nine months later and a surge in encounters even less plausible because the use of MPP actually declined much earlier. *See* ROA.2343; *see also* U.S. Customs and Border Protection, MPP FY 2020, https://go.usa.gov/xFA4X.

The district court's findings with respect to anticipated costs are similarly unsubstantiated. The court first found that "Plaintiffs have established that the termination of MPP will increase the cost of providing driver's licenses to aliens released and paroled into the United States." ROA.2940. The district court reasoned that a "predictable effect" of terminating MPP is that individuals who otherwise would be subject to MPP will be released, settle in the Plaintiff States, and seek driver's licenses. *Id*. This speculative analysis, not based on any evidence that either State has issued a single additional driver's license that can be traced to MPP's termination, falls far short of the "irreducible constitutional minimum of standing," which requires more than a "conjectural" or "hypothetical" injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The district court noted Texas's "Driver License Division gave estimates of the costs of providing additional driver's licenses." ROA.2937. But that declaration does not identify any actual increase in costs or even assert that there has been an increase. It merely speculates that if there were "an increase in the number of individuals authorized to be in the United States who choose to reside in Texas," it would increase driver's license costs. ROA.1588. The same is true for the declaration the district court cited for Missouri. ROA.1166.

This Court has previously rejected attempts to establish standing based on this kind of speculative evidence. In *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), the Court held that a State failed to establish standing to challenge DACA where it

15

"submitted no evidence that any DACA eligible immigrants resided in the state." *Id*. at 252. Simply providing evidence that a "state provides social benefits" to state residents and speculation that costs will increase if the population increases is insufficient to satisfy the requirements of Article III standing, which "mandate" Plaintiffs show "a 'concrete and particularized' injury that is 'fairly traceable'" to the challenged government action. *Id*.; *cf. Texas v. United States*, 106 F.3d 661 (5th Cir. 1997) ("State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review.").

When this Court previously recognized driver's-license standing it set a much higher evidentiary burden than the district court applied here. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). In that case, this Court cited evidence that "DAPA would enable at least 500,000 illegal aliens in Texas" to obtain lawful presence and thus driver's licenses Texas would subsidize, leading to costs of "several million dollars." *Id*. at 155. The Court viewed these costs as directly traceable to deferred action because "DAPA would be the primary cause and likely the only one" for the "dramatic increase in the costs of the driver's-license program." *Id*. at 160. In contrast, Plaintiffs presented no evidence here that terminating MPP will lead to more people in the Plaintiff States, increased eligibility for driver's licenses, or that either State had issued a *single* additional driver's license as a result.

16

Because this case was decided after trial, unlike the appeal from a preliminary injunction in *Texas*, the district court also erred in not holding Plaintiffs to a higher burden of proof here. *See Lujan*, 504 U.S. at 561 (noting "burden of proof" increases with "successive stages of litigation"); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) (at the "preliminary injunction" stage plaintiffs need only show they "likely" can establish standing).

The district court also failed to address the additional requirements for standing under a driver's-license theory. In *Texas*, the government objected that driver's-license standing risked opening the door to challenges based on any policy disagreement. 809 F.3d at 161. The Court explained, however, that "standing requirements would preclude much of the litigation the government describes," as "causation could be a substantial obstacle" in other cases because the "state must allege an injury that has already occurred or is 'certainly impending.'" *Id*. at 161-62. As noted above, the Court held the "causal chain" was "especially direct" in that case, *id*. at 153, but noted that "it would be difficult to establish standing" with respect "to a single alien based on the driver's license theory," *id*. at 162. And the Court emphasized that the "calculation of Texas's loss from DAPA was based largely on the need to hire employees, purchase equipment, and obtain office space," "steps that would be unnecessary" with a smaller number of additional individuals seeking driver's licenses. *Id*. Here the district court did not find, and Plaintiffs did

not allege or submit any evidence that they had been forced to hire additional staff or pay for additional infrastructure to provide licenses since the suspension of new enrollments in MPP 8 months ago.

The "determination that Texas ha[d] standing" in the DAPA case was also "based in part on the 'special solicitude'" the Court afforded Texas, and the Court emphasized that "[w]ithout 'special solicitude,' it would be difficult for a state to establish standing." 809 F.3d at 162. But "special solicitude" does not liberate States from their obligation to satisfy Article III's requirement for a concrete injury in fact, *see Massachusetts v. E.P.A.*, 549 U.S. 497, 522 (2007), which they have not done here. In addition, this Court has explained that, among other things, "a state likely must be exercising a procedural right created by Congress" to obtain special solicitude. *Texas*, 809 F.3d at 162. The procedural right in *Texas* was the claim that the challenged policy had to go through notice-and-comment rulemaking, *id*. at 177-78. The Court explained that, where "a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision." *Id.* at 150-51.

The district court sidestepped this requirement simply by noting that "the Fifth Circuit has already held that the APA provides Texas the procedural right needed for special solicitude." ROA.2943. But Plaintiffs did not argue that terminating MPP required notice-and-comment rulemaking, nor could they. *See Innovation Law Lab*

18

*v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019). Granting special solicitude for any APA claim, rather than notice-and-comment claims in cases where a State has put forth evidence of a concrete injury, contradicts this Court's caution that the "factors" necessary to obtain special solicitude "will seldom exist," *Texas*, 809 F.3d at 162, and the acknowledgment that its standing holding was limited by the fact that "numerous policies that adversely affect states either are not rules at all or are exempt from the notice-and-comment requirements," *id.* at 161; *see also Massachusetts*, 549 U.S. at 520, 522 (finding special solicitude where Congress created specific "procedural right" to petition for and challenge denial of "rulemaking," after finding concrete injury to state's property interests).[4]

The district court's finding that "[t]he same line of reasoning applies to the increased healthcare costs, education costs, and enforcement and correctional costs that Plaintiffs will suffer because of the termination of MPP," is similarly erroneous. As to healthcare costs, the district court again cited agency metrics, but not any actual evidence of increased healthcare costs related to MPP's termination. ROA.2937-38 (citing MPP metrics and evidence related to State healthcare expenses well before MPP ended). The district court concluded that "total costs to the State

---

[4] The non-binding motions panel ruling did not address any of these limitations when it cited *Texas* to conclude the district court's ruling was "grounded in [] precedent." *Texas*, 2021 WL 3674780, at *5. And the panel's statement that the facts underlying the standing ruling were uncontested is plainly incorrect. *See, e.g.*, ROA.2842-47, 2868-74.

will increase as the number of aliens within the state increases," but without citing any evidence that there had been any such increase. ROA.2938 (citing ROA.1613 (speculating that "to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year," healthcare costs will "reflect [these] trends")).

For educational costs, the district court cited a declaration setting out annual costs per student for "unaccompanied children ('UAC')." ROA.1603, 2937. But as the district court acknowledged earlier in its decision, MPP did not apply to "unaccompanied alien children." ROA.2927; *see* ROA.1844. Costs related to educating groups that cannot be placed in MPP cannot be redressed by reinstating MPP and cannot form a basis for challenging it. Citing solely this declaration's speculation about possible future costs in Texas related to UACs, the court found that: "total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases." ROA.2937 (citing ROA.1603).

The district court's finding with respect to law enforcement and correctional costs was based on the finding that "[s]ome aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will commit crimes in Texas and Missouri." ROA.2938. But not a *single* document the court cited mentions crimes or criminal activity. *Id*. The district court's apparent view of

noncitizens as likely criminals is not evidence, and speculation about future crimes is no basis for standing. *See Clapper*, 568 U.S. at 414; *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Arpaio*, 797 F.3d at 22 (rejecting argument "that more immigrants mean more crime" because "crime is notoriously difficult to predict" and "affected by numerous factors"). The district court's finding that "[s]ome aliens who would have otherwise been enrolled in MPP are victimized by human traffickers in Texas," "caus[ing] fiscal harm to Texas and Missouri," ROA.2938, includes no finding that terminating MPP somehow increases human trafficking, nor could it, as there is no record evidence to support that claim. Nor did the district court address the substantial evidence that criminal activity along the border increased while MPP was in effect, ROA.2057, 2105, 2273, 2297, or the Secretary's explanation that ending MPP would allow DHS to instead focus on "expanding cooperative efforts to combat smuggling and trafficking networks." ROA.1689.

In any event, even if the various costs the district court identified were both non-speculative and adequately supported by the record, they still would not suffice to establish standing. The district court's contrary conclusion rests on the flawed assumption that any increase in population that may cause some increase in costs provides standing. But a State's decision to voluntarily adopt and fund a State benefit for all residents does not give the State standing to challenge any policy or action that might have some marginal effect on the State's population. *See Pennsylvania v.*

*New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"). A "state official has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015). The district court's theory of standing has no principled limit and suggests that the States have standing to object anytime the government exercises its discretion not to remove a single noncitizen, something this Court distinguished as not supported by its holding in *Texas*. *See* 809 F.3d at 161 (addressing difficulty in establishing "standing to challenge a grant of asylum to a single alien"). Indeed, the district court's theory suggests that a State may sue whenever the federal government takes *any* action that can be expected to increase the number of people (noncitizens or not) within its borders. By the same logic, other States could challenge any federal policy that might reduce their population, on the theory that residents pay taxes and confer other benefits. Such a limitless theory of standing is untenable.

Finally, the alleged injuries are not redressable. Plaintiffs do not dispute that MPP did not apply to various groups arriving at the border, such as Mexican nationals, and no one can be returned without Mexico's cooperation. *See Lin v.*

22

*United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017) (redressability cannot be shown where relief requires action by "foreign nations not before the court" (collecting cases)). And Plaintiffs concede that even when someone "was eligible for MPP, the policy did not mandate return" or limit "discretion to process" "under other procedures," ROA.1035, meaning MPP did not actually require that *anyone* be returned.

## II. The Secretary's Decision is Not Subject to Judicial Review.

The States' claims are not reviewable under the APA. The district court's holdings to the contrary are deeply flawed. ROA.2944-52.

Committed to Agency Discretion. The APA precludes review of decisions "committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2), and the INA similarly prohibits review of any "decision or action" of the Secretary "the authority for which is specified under this subchapter to be in [his] discretion," 8 U.S.C. § 1252(a)(2)(B)(ii). Each of those provisions independently prevents review of the Secretary's decision whether to use contiguous-territory-return authority. That authority is entirely discretionary: the Secretary "*may* return" certain noncitizens to a contiguous territory. 8 U.S.C.

23

§ 1225(b)(2)(C) (emphasis added); *Jama v. ICE*, 543 U.S. 335, 346 (2005) (Congress's use of "may" "connotes discretion").[5]

In addition, "the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). The Secretary's decision whether to exercise his return authority resembles classic exercises of prosecutorial discretion because it involves a "complicated balancing" of factors "peculiarly within [the Executive's] expertise," including how to best expend limited "agency resources" and whether a "particular enforcement action … fits the agency's overall policies." *Heckler*, 470 U.S. at 831. The concerns justifying prosecutorial discretion are "greatly magnified in the [immigration] context," *Crane*, 783 F.3d at 247, which implicates the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy," *Arizona v. United States*, 567 U.S. 387, 397 (2012).

Here, the Secretary weighed those concerns and determined that "agency resources are best spent on … [other]" programs for managing immigration. *Heckler*, 470 U.S. at 831; *see* ROA.1684-90. Congress vested that authority with the Secretary, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3), and it would be improper for

---

[5] The discretionary nature of Section 1225(b)(2)(C) is reinforced by the fact that DHS cannot return noncitizens to a contiguous territory without the consent of a foreign government. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 700-01 (2001).

courts to displace the Executive's enforcement discretion. Decisions on how and where to secure noncitizens during removal proceedings are quintessential enforcement decisions inextricably intertwined with the decision to pursue removal. *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013). And contrary to the motions panel's non-binding reasoning, *see Texas*, 2021 WL 3674780, at *8, the Supreme Court has held that eliminating an entire program can be a non-enforcement action committed to agency discretion and "accordingly unreviewable under § 701(a)(2)," where there is no meaningful standard for courts to apply. *Lincoln*, 508 U.S. at 193.

The district court erroneously believed MPP was reviewable for the same reasons the DACA program was reviewable in *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020). ROA.2949. But the Supreme Court held DACA was not committed to agency discretion because "it created a program for conferring affirmative immigration relief." *See Regents*, 140 S. Ct. at 1906. Terminating MPP is a "passive nonenforcement policy" that guarantees no attendant benefits, such as relief from removal or work authorization. *Id*; *accord Texas*, 809 F.3d at 168 (distinguishing DAPA's affirmative benefits from unreviewable discretionary nonenforcement decisions). The district court erroneously determined that not returning noncitizens under MPP created affirmative benefits because they may be paroled, and if so, might apply for employment authorization. ROA.2950. But the

memorandum says nothing about how DHS should use parole or employment authorization, and employment authorization for parolees is not automatic, *see Texas*, 787 F.3d at 759 & n.80.

The district court purported to find a relevant standard to cabin the Secretary's return discretion in Section 1225, which the court read to impose a near-universal detention mandate for applicants for admission and to require DHS "to return aliens to Mexico when an influx of aliens exceeds DHS's detention capacity." ROA.2950. As explained below, the district court fundamentally misunderstood Section 1225, which does not mandate detention of noncitizens not otherwise subject to return in these circumstances. And in light of that error, the court's reviewability holding collapses: None of the detention provisions reference Section 1225(b)(2)(C) or its discretionary return authority, and so "the statutory scheme … provides absolutely no guidance as to how that [return] discretion is to be exercised." *Texas*, 809 F.3d at 168; *see also Texas v. United States*, No. 21-40618, 2021 WL 4188102, at *3-4 (5th Cir. Sept. 15, 2021) (holding decisions on who should face a particular type of "enforcement action" are "committed" to the agency's "enforcement discretion, including in the immigration arena").

Finally, the motions panel also found standards cabining DHS's discretion in the APA's authorization to set aside agency action that is "arbitrary, capricious, [or] contrary to law." *Texas*, 2021 WL 3674780, at *6-7. But the APA itself cannot

supply the requisite "meaningful standard," *Lincoln*, 508 U.S. at 191 (citation omitted), because Section 701 is a gateway requirement that precedes review under the APA's arbitrary-and-capricious standard. *See* 5 U.S.C. § 701(a) ("This chapter applies, according to the provisions thereof, *except to the extent that* … agency action is committed to agency discretion by law.") (emphasis added).

Zone of Interests. Plaintiffs' claims also fail because they do not fall within the zone of interests of Section 1225(b)(2)(C), and thus Plaintiffs lack a cause of action to enforce that provision. The zone-of-interests inquiry requires a plaintiff to show that Congress intended for a particular plaintiff to be able to invoke a particular statute to challenge agency action. *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Nothing in Section 1225, or the INA generally, suggests that Congress intended to permit the States to invoke speculative, attenuated financial impacts to contest the Secretary's exercise of his contiguous-territory return authority. To the contrary, a litigant does not have a "judicially cognizable interest" in another's prosecution, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), or "in procuring enforcement of the immigration laws" against third parties in particular ways. *Sure-Tan, Inc. v. NLRB*, 457 U.S. 883, 897 (1984). Congress has enacted several provisions specifically "aimed at protecting the Executive's discretion from the courts," *Reno v. Am.-Arab Anti-Discrimination Comm.* ("AADC"), 525 U.S. 471,

486–87 (1999), making clear that only noncitizens may challenge enforcement decisions, and only certain types of decisions, and typically only through their removal proceedings. *E.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g).

The district court nevertheless held that States fell within Section 1225's zone of interests because the detain-or-return mandate the court read into Section 1225 might, in the court's view, reduce the States' costs. ROA.2951. As explained below, there is no such mandate. And, in any event, Congress said nothing in Section 1225 about benefiting States or saving them from attenuated financial burdens, and courts have rejected arguments that an interest in "limiting immigration" or a disagreement with the government's "scheme for parole" brings a party within the zone of interests. *See Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900-01 (D.C. Cir. 1996); *accord I.N.S. v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers).

Final Agency Action. The district court also erred in holding that the Secretary's general statement of policy was a reviewable final agency action. ROA.2944-46.

A "final agency action" is one that both "consummat[es] the agency's decisionmaking process" and determines "rights or obligations" or produces "legal

28

consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The June 2021 Memorandum ending MPP, like the January 2019 Memorandum creating MPP, is a "policy statement" through which "an agency simply lets the public know its current enforcement or adjudicatory approach," leaving the agency "the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). *See Innovation Law*, 924 F.3d at 509 ("MPP qualifies as a general statement of policy"). A "general statement of policy" typically "is not a 'final agency action,' rendering it unreviewable." *Cohen v. United States*, 578 F.3d 1, 6 (D.C. Cir. 2009), *opinion vacated in part on other grounds*, 650 F.3d 717 (D.C. Cir. 2011) (en banc).[6]

The motions panel stated that *Merchs. Fast Motor Lines, Inc. v. ICC* held that a policy statement can nonetheless be final agency action, *Texas*, 2021 WL 3674780, at *6, but that case, which addressed ripeness, provided no analysis on this issue, and notably held that the policy should be tested "in a concrete situation" and that,

---

[6] A "statement of policy" is not "final agency action" unless and until it is applied "in a particular situation" to a regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *see Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Terminating MPP merely stated the agency's general approach to using its discretionary return authority under Section 1225(b)(2)(C) but did not bind DHS to any course with respect to returns in the future. *See Syncor Int'l Corp.*, 127 F.3d at 94. As Defendants explained, the "consummation of the decisionmaking process" does not occur, and there are no legal consequences, until the return decision is made in an individual case. ROA.2405-07. The district court wrongly concluded that "the parties do not contest that the June 1 Memorandum marks the consummation of the decisionmaking process." ROA.2945.

as a general policy statement, was "not ripe for judicial consideration." 5 F.3d 911, 919-20 (5th Cir. 1993). The district court erroneously concluded that legal consequences nonetheless flow from the June 1 Memorandum because it ended MPP, thereby "prevent[ing] DHS line officers from using MPP, a tool that was previously available to them." ROA.2945. The motions panel echoed this reasoning. *Texas*, 2021 WL 3674780, at \*6 (quoting *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019)). Both conclusions are wrong: terminating MPP did not end DHS's statutory authority under Section 1225(b)(2)(C) to conduct returns. The "tool" authorizing returns is Section 1225(b)(2)(C); MPP was merely a statement of policy as to how that discretionary tool would be applied. *See Innovation Law Lab*, 924 F.3d at 509. Where the "withdrawal of discretion" does not bind the agency to a narrower view of its statutory authority and thus "leaves the agency 'the discretion and the authority to change its position ... in any specific case' and 'does not seek to impose or elaborate or interpret a legal norm,'" it is not final agency action. *EEOC*, 933 F.3d at 442 (quoting *Syncor*, 127 F.3d at 94). The June 1 Memorandum did not impose a legal norm or limit the scope of DHS's authority to use Section 1225(b)(2)(C) in the future, including by making returns on an ad-hoc basis, ROA.1685, 1688, and thus is not final agency action.

## III. The Secretary's Decision Does Not Cause DHS to Violate Section 1225.

Section 1225 establishes procedures for processing certain applicants for admission. Section 1225(b)(1)(B)(ii) provides that an applicant for admission who is placed in expedited removal and demonstrates a credible fear of persecution "shall be detained for further consideration of the application for asylum," and Section 1225(b)(2)(A) provides that noncitizens seeking admission and placed in full removal proceedings "shall be detained" for those proceedings.

The district court accepted Plaintiffs' argument that those provisions establish that "Section 1225 provides the government two options vis-à-vis aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory," so that "[f]ailing to detain or return aliens pending their immigration proceedings violates Section 1225." ROA.2961. In a footnote, the court noted DHS's discretion to release applicants for admission on parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), but the court stated that DHS may not grant parole "simply because DHS does not have the detention capacity," ROA.2961. Therefore, the district court found, whenever DHS "cannot meet [its] detention obligations" due to lack of capacity, failing to use "MPP necessarily leads to the systemic violation of Section 1225." ROA.2962. It accordingly ordered that MPP be implemented "until such a time as the federal government has sufficient detention capacity to detain all aliens subject to

31

mandatory detention under Section [1225] without releasing any aliens because of a lack of detention resources." ROA.2970.

That conclusion is mistaken. At the outset, the operative complaint challenges the Secretary's June 1 Memorandum terminating MPP, not any DHS policy regarding release from detention or parole. ROA.1045-56. More importantly, even if the district court were correct that Section 1225 bars DHS from releasing on parole applicants for admission that it lacks capacity to detain, nothing in the statute suggests a relationship between any purported detention mandate and the return authority, such that the Secretary is *required* to return any noncitizen he fails to detain. Plaintiffs cannot use their objection to DHS's parole practices as a wedge to invalidate the Secretary's separate decision regarding whether to continue using the *discretionary* return authority. *Cf. Texas v. W. Pub. Co.*, 882 F.2d 171, 177 (5th Cir. 1989) ("Texas cannot bootstrap itself into a decision on the validity claim by asserting secondary claims that necessarily depend on the resolution of the primary claim.").[7] Rather than provide any guidance in the statute for when DHS should use the contiguous-return authority in Section 1225(b)(2)(C), Congress codified the return authority as discretionary. And even if it had not, the Supreme Court has held

---

[7] The administrative record did not contain evidence concerning release practices and policies, and the district court independently abused its discretion by relying on "evidence outside the administrative record." *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988).

that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005); *see Texas*, 2021 WL 4188102, at *3-4 (holding detention provisions do not eliminate discretion to decide "who should face enforcement action in the first place," since these decisions are "committed" to the agency's "enforcement discretion, including in the immigration arena").

In any event, Section 1225 does *not* impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory. Contrary to the district court's assertion of a binary, discretion-less choice, the INA provides DHS with multiple options for processing noncitizens beyond returns or detention. The statute is clear, for example, that DHS "*may ... in [its] discretion*" release a noncitizen placed in Section 1229a proceedings through "parole" "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Other provisions provide that, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "*may*" be released on "bond" or "conditional parole," § 1226(a)(2)(A)-(B) (emphasis added). Subject to specific legal constraints, Congress has in various provisions entrusted the decision whether to detain, release, or return a particular noncitizen to the Secretary's

33

discretion by using discretionary language and barring judicial review. *See* 8 U.S.C. §§ 1182(d)(5)(A), 1225(b)(2)(C); 1226(a); *Loa-Herrera v. Trominski,* 231 F.3d 984, 991 & n.12 (5th Cir. 2000) ("[Secretary's] discretionary judgment regarding the application of [§ 1226]—including the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is not ... subject to review." (citing 8 U.S.C. § 1226(e))). The district court's core legal analysis is thus categorically mistaken: the statute does not impose on DHS a binary choice between detention or return for noncitizens arriving from Mexico.[8]

The history of the return provision, and the absurd results that would follow from the district court's view, further undermine the court's detain-or-return rationale. Congress enacted Section 1225(b)(2)(C) in 1996 to codify statutory authority for ad hoc returns that the Board of Immigration Appeals had found lacking. *In re M-D-C-V-*, 28 I.&N. Dec. 18, 25-26 & n.10 (B.I.A. 2020). But MPP— and its broad use of return authority—came into existence only in 2019. ROA.1834. By the district court's logic, ROA.2950, every presidential administration for nearly the last 25 years has repeatedly violated Section 1225 by paroling or otherwise

---

[8] The Court's characterization of contiguous return as an alternative to detention under Section 1225(b)(1), ROA.2950, 2959-61, is particularly misguided, as noncitizens in ongoing expedited removal proceedings are not eligible for contiguous return, *see* 8 U.S.C. § 1225(b)(2)(B)(ii).

releasing inadmissible applicants for admission due to a lack of detention space, rather than returning them to Mexico. And under the injunction, all future administrations will be required to return all eligible noncitizens arriving from Mexico until the government can detain every applicant for admission subject to Section 1225—a condition Congress has never appropriated sufficient funds to satisfy. ROA.2987-90; ACLU Stay Mot. Amicus at 8-9.

The government's longstanding practice on this matter is firmly grounded in the statute. As then-Attorney General Barr explained, Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings," because 8 U.S.C. § 1182(d)(5)(A) "grants the Secretary discretion to parole." *In re M-S-*, 27 I. & N. Dec. 509, 516-517 (A.G. 2019). DHS has long interpreted Section 1182(d)(5) to authorize parole of noncitizens who "present neither a security risk or a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5). And it is the agency, not the court, that determines what undefined statutory terms like "significant public benefit" warranting parole may include, *see* 8 U.S.C. §§ 1103(a)(1), 1182(d)(5), and that determination has always encompassed resource constraints, *see Padilla v. ICE*, 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021) (describing ICE policy allowing parole "in light of available detention resources"); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 324

35

(D.D.C. 2018) (describing DHS's "Parole Directive," effective since 2009); ROA.2989-90.

The motions panel declined to endorse the district court's broad requirement that all noncitizens subject to Section 1225 must be detained if not returned, explaining that the government has other options, including parole or bond, and that the injunction merely prohibits the government from "simply releas[ing] every alien described in § 1225 *en masse* into the United States." *Texas*, 2021 WL 3674780, at *14. And the Supreme Court noted that its denial of the stay request "should not be read as affecting the construction of th[e] injunction by the Court of Appeals." No. 21A21 (Aug. 24, 2021). Despite recognizing the flaws in the district court's logic, the motions panel nevertheless held that the government was unlikely to succeed in showing that the termination memorandum does not violate Section 1225. *Texas*, 2021 WL 3674780, at *8. But the district court's reasoning necessarily depended on treating contiguous-territory return as the *only* available mechanism for processing non-detained applicants for admission arriving on land from Mexico. The motions panel properly rejected that logic, without which the district court's conclusion cannot stand.

The motions panel's more modest conclusion that the government may not release "every alien . . . *en masse*," *Texas*, 2021 WL 3674780, at *14, does not support the injunction. The evidence before the district court did not establish that

DHS is releasing noncitizens "*en masse*," and the district court cited nothing about the prevalence of parole except one law professor's unsubstantiated opinion in a newspaper article that detention space, and not any other factor, drives release determinations,[9] and outdated statistics on the agency's website, which were later removed and revised. ROA.2961 n.11. Rather, the evidence establishes that the government is detaining at or near its capacity limits. ROA.2988 (senior DHS official attesting agency detained 25,671 noncitizens as of August 16, 2021—75% of its funded capacity and the maximum permitted under current CDC COVID-19 guidance).

The district court's attempt to enforce its view of Section 1225 also violates Section 1252(f). That provision states that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter,[10] … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

Section 1252(f) applies in this case by its plain terms. The district court "restrain[ed]," the "operation" of a covered provision, Section 1225(b)(2)(C), in a

---

[9] And this opinion was characterizing parole practices while MPP was in effect, not under current conditions. ROA.1867.

[10] Part IV of the covered subchapter includes Section 1225.

mandatory injunction that was not limited to "an individual alien against whom proceedings … have been initiated." *Id*.; *Gayle v. Warden Monmouth Cty. Corr. Institution*, 2021 WL 4006189, at *10 (3d Cir. 2021) (injunctive relief affecting operation of covered provisions "with respect to more than just an individual alien" is barred by Section 1252(f)(1) (quotation marks omitted)). In these circumstances, only the Supreme Court—not the District Court for the Northern District of Texas— has jurisdiction to enter such relief. 8 U.S.C. § 1252(f)(1); *see AADC*, 525 U.S. at 481, 487 ("§ 1252(f) plainly serves as a limit on injunctive relief").

The district court brushed aside Section 1252(f) as a bar to the nationwide injunctive relief it ultimately granted simply by adopting Plaintiffs' assertion that they were "not seeking to *restrain* Defendants from enforcing Section 1225," but rather "attempting to make Defendants *comply* with Section 1225." ROA.2947. As two Justices have explained, that reasoning "is circular and unpersuasive." *Nielsen v. Preap*, 139 S. Ct. 954, 975 (2019) (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in the judgment). "Many claims seeking to enjoin or restrain the operation of the relevant statutes will allege that the Executive's action does not comply with the statutory grant of authority, but the text clearly bars jurisdiction to enter an injunction '[r]egardless of the nature of the action or claim.'" *Id*.; *Hamama v. Adducci*, 912 F.3d 869, 879 (6th Cir. 2018) (overturning injunction as barred by Section 1252(f)(1) and rejecting argument that "district court was not enjoining or

restraining the statutes, but rather interpreting them to ensure they are correctly enforced") *cert. denied*, 141 S. Ct. 188 (2020).

As noted above, the district court invented out of whole cloth a mandate and standard for when the Executive is required to use the contiguous-territory-return authority in Section 1225(b)(2)(C) that does not exist in the statute, and then enjoined the agency to comply with that standard. ROA.2970. Because Section 1252(f) prohibits injunctive relief enforcing the covered statutory provisions, it *a fortiori* prohibits adopting "new standards that the government must meet" beyond what is set out in the statute. *Hamama*, 912 F.3d at 879. Section 1252(f)(1) deprives courts of the "jurisdiction or authority to enjoin or restrain the operation of [Section 1225's] provisions." *Id*. The district court's ruling that it could, without running afoul of Section 1252(f)(1), enter an injunction directing that Section 1225(b)(2)(C) must operate in specific ways not mandated by the statute improperly "reads the words 'the operation of' out of the statute." *Gonzalez v. ICE*, 975 F.3d 788, 827 (9th Cir. 2020) (Bade, J., dissenting). Section 1252(f)(1) does not simply "insulate *provisions* from injunctive relief; it insulates the *operation* of those provisions." *Id*.; *Nken v. Holder*, 556 U.S. 418, 431 (2009) (Section 1252(f)(1) prohibits "injunctions against the operation of removal provisions").

The district court acknowledged that it was not ordering compliance with a requirement Congress expressly included in the statute, but rather ordering DHS to

abide by "implicit[]" requirements the court read into the statutory text. ROA.2950. If placing "limitations on what the government can and cannot do under the removal and detention provisions are not 'restraints,' it is not at all clear what would qualify as a restraint." *Hamama*, 912 F.3d at 879-80 (holding Section 1252(f)(1) barred injunction that "created out of thin air a requirement" related to detention of noncitizens "that does not exist in the statute"). Congress easily could have included in Section 1225 requirements for when Section 1225(b)(2)(C)'s return authority must be used but it chose not to, electing instead to leave that choice to the Secretary's discretion—discretion that Congress barred courts from restraining in Section 1252(f)(1).

In short, the district court's determination that terminating MPP necessarily causes Defendants to violate Section 1225 is not supported by the statutory text, regulations, agency decisions, or the history of detention of noncitizens under Section 1225 since its passage. The district court's injunction also contravenes the express jurisdictional limitations imposed by Section 1252(f). This Court should therefore vacate the injunction to the extent it depends on the district court's Section 1225 reasoning, including by vacating the condition requiring DHS to implement MPP until it has sufficient detention capacity to detain all noncitizens potentially subject to Section 1225.

## IV. The Secretary's Decision Satisfies the APA.

The Secretary's decision satisfies the APA's "highly deferential" standard of review, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983), because the decision acknowledges the agency's change of position and is fully explained and supported by the record, *see FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158, 1160 (2021).

The Secretary's decision articulates a clear connection between terminating MPP and achieving the Administration's objectives to address the root causes of migration, improve regional migration management, and expand bilateral efforts to combat smuggling and trafficking networks. At the President's direction, the Secretary reviewed "MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over" its course; "prior DHS assessments of the program"; and "the personnel and resource investments required of DHS to implement the program." ROA.1686. The Secretary described how he considered the relevant information, including the effectiveness of efforts to address challenges identified in the prior administration's assessments of MPP, and concluded that "MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." ROA.1686; *see* 1875-86, 2109-41, 2151-70, 2226-33, 2272-2304, 2334-36. He also considered alternatives and the impact of terminating MPP. ROA.1688. Ultimately, the Secretary found that, "on

41

balance, any benefits of maintaining … MPP are far outweighed by the benefits of terminating the program." ROA.1689.

That analysis amply satisfies the "narrow" "scope of review under the 'arbitrary and capricious' standard" under which a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In assessing agency action, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, to satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). And an agency decision is not "subjected to more searching review" simply because it is changing course—the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 514-15. Here, to the extent the Secretary reached different conclusions than those set out in prior MPP assessments, he adequately

explained why subsequent developments or different foreign-policy priorities warranted changes. Nothing more is required.

The district court's contrary ruling is deeply flawed. The court stated that DHS "ignored critical factors," such as prior assessments regarding MPP's goal of encouraging noncitizens without meritorious claims to return home. ROA.2953-54. But the memorandum, and lengthy record supporting it, show that the Secretary evaluated all "prior DHS assessments of the program" and "the anticipated benefits and goals articulated at the outset of the program and over [its] course." ROA.1686; *see also* ROA.1834, 1875-86, 2135, 2173, 2226, 2237-38. Rather than ignore "the importance of deterring meritless asylum applications," ROA.2954, the Secretary simply exercised his judgment and discretion to address that problem using different policy tools. For example, the Secretary described other "reforms" the Administration is undertaking—including creation of a dedicated docket for certain noncitizens arriving at the border—to improve the processing of asylum applications and "promote compliance and increase appearances throughout proceedings." ROA.1689 (noting "additional anticipated regulatory and policy changes").

The Secretary also noted ways in which MPP had failed to accomplish its goals effectively. DHS "originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs," but in fact, "backlogs increased." ROA.1687; *see* ROA.1870, 2336. The Secretary also noted the "focus

on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their proceedings," which combined with the "approximately 44 percent" of "cases completed through the entry of *in absentia* removal orders," raised questions for him "about the design and operation of the program." ROA.1687; *see* 2240-63, 2317-21, 2343-46. And although MPP was "intended to reduce burdens" on DHS personnel and resources, "the program imposed additional responsibilities that detracted from [DHS's] critically important mission sets." ROA.1687; *see also* ROA.2135-38, 2343-56. The Secretary never denied that MPP may have had some benefits, but he did conclude that MPP had not deterred non-meritorious asylum claims or reduced border surges with sufficient efficacy to justify its enormous opportunity and operational costs.

The district court also concluded that the Secretary had failed to consider "warnings by career DHS personnel" that terminating MPP might "lead to a resurgence of illegal aliens attempting to illegally" enter. ROA.2955. That ruling is based entirely on inadmissible hearsay about what prior DHS officials believe other officials *may* have told the presidential transition team. But the transition team is not the agency, and as the district court acknowledged, those statements are "not part of the administrative record." ROA.2955 n.10.[11] Moreover, whether or not such

---

[11] The district court improperly relied on evidence outside the administrative record in ruling on the merits of Plaintiffs' claims. *See Fla. Power & Light Co. v.*

44

warnings were conveyed, the record establishes that the Secretary did not ignore that risk; to the contrary, he sought to address it using different strategies that he reasonably believed would "improve border management and reduce migration surges more effectively and more sustainably than MPP." ROA.1688. The actual administrative record showed that over a quarter of MPP enrollees were subsequently reencountered attempting to enter—meaning MPP produced, at least in those cases, *additional* border encounters. ROA.1687, 2343-56. And the district court's insistence that DHS was required to investigate whether border encounters increased after new enrollments were suspended, ROA.2955, makes little sense given that MPP enrollments declined much earlier due to COVID-19 and Title 42.

The court next stated that DHS had failed to consider the States' "fiscal harm from the termination of MPP." ROA.2955. But the States submitted no evidence of additional costs since April 2020, when MPP enrollments significantly declined, or since January 2021, when new enrollments were suspended. ROA.1686. The district court emphasized that it had "already found that the states face fiscal harm from the termination of MPP," ROA.2955, but as explained above, there is no evidence in the record of such fiscal harms. The Secretary's decision cannot be arbitrary and

---

*Lorion*, 470 U.S. 729, 243-44 (1973); *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). The government objected to this particular piece of evidence as inadmissible hearsay, but the district court relied on it without ever specifically ruling on that objection. ROA.3072-74, 3077.

capricious for failing to consider wholly speculative harms. And, in any event, the Secretary *did* consider "the impact such a decision could have on border management and border communities." ROA.1687-88; *see* ROA.2265, 2363.

In the same vein, the district court observed that *Regents* listed "damage to a state's coffers" as a possible reliance interest. ROA.2955; *see Texas*, 2021 WL 3674780, at *9 (similarly faulting Secretary for failing to address purported reliance interests). *Regents*, however, said that legitimate reliance interests were "one factor to consider" in that context; it did not categorically hold that costs to States must be considered in undertaking any and all agency actions, 140 S. Ct. at 1914. The portion of *Regents* the district court cited is from the summary of the respondents' argument, not the Court's holding. *Id*.

The Plaintiff States have not established any cognizable reliance interests in MPP. As the government repeatedly explained, Plaintiffs never identified any particular actions they took in reliance on MPP, such as budgeting decisions they made based on the number of noncitizens expected to be returned under MPP, let alone any "substantial," long-held reliance sufficient to create interests the Secretary was required to consider. *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (addressing regulatory change that would upset "decades of industry reliance" and potentially result in "substantial" and potentially "retroactive" legal "liability"). The district court did not identify any specific actions the States took in

reliance on MPP that the Secretary failed to consider. The Secretary's decision cannot be arbitrary and capricious for failing to imagine and fully consider potential reliance interests the States never articulate. Even in notice-and-comment rulemaking, an agency decision cannot be arbitrary and capricious for failing to consider an issue that was not "raised by any commenter." *10 Ring Precisions, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013). Unnamed reliance interests cannot be enough to upset the Federal Government's authority and broad discretion over immigration so easily. *See Arizona*, 567 U.S. at 394, 402.

To upset an agency action on the basis of legitimate reliance interests requires far more than what the district court vaguely found here. In *Regents*, the Court's holding was grounded in the fact that, unlike MPP, DACA "created a program for conferring affirmative immigration relief." 140 S. Ct. at 1906. Based on the "reliance interests engendered by DACA," individuals were potentially "caught in the middle of a time-bounded commitment," and there was a "need for DACA recipients to reorder their affairs" without additional time to "graduate from their course of study, complete their military service, or finish a medical treatment regimen." 140 S. Ct. at 1914-15. And cases typically require that a policy change would lead to some unexpected civil or criminal liability for the regulated industry or individuals before reliance interests are cognizable. *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655,

670-75 (1973); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015). The States were not regulated by MPP and have not cited any actions they took in reliance on it or any legal liability they might incur as a result of its rescission.

The motions panel also faulted the Secretary for failing to address an agreement that was signed just before the Presidential transition and purported to require DHS to consult with Texas before changing immigration policy. *Texas*, 2021 WL 3674780, at *10. The panel viewed it as "likely arbitrary and capricious for DHS not even to acknowledge its agreement." *Id*. n.4. But the Secretary's predecessor sent a letter to Texas on February 2, 2021, long before the termination of MPP, communicating the agency's view that the "purported 'Agreement'" was "void, not binding, and unenforceable." ROA.1508. The Secretary was not required to discuss an agreement that the agency had concluded was void months before.

The district court also held the Secretary had failed to consider "more limited policies" than terminating MPP. ROA.2956. That is incorrect. The Secretary expressly "considered various alternatives, including maintaining the status quo or resuming new enrollments in the program," and concluded that "preserving MPP in this manner" would "be a poor use of [DHS] resources" given that the identified defects in the program "would require a total redesign that would involve significant additional investments in personnel and resources." ROA.1688. He further noted that, "[p]erhaps more importantly, that approach would come at tremendous

48

opportunity cost, detracting from the work taking place to advance the [Administration's] vision for migration management and humanitarian protection." *Id*. "DHS was not required … to 'consider all policy alternatives in reaching [its] decision,'" and has "considerable flexibility" when deciding how to "wind-down" a program. *Regents*, 140 S. Ct. at 1914-15 (quoting *State Farm*, 463 U.S. at 51). The court's conclusion that DHS was required to set out "example" alternative versions of MPP, ROA.2956, reflects a misunderstanding of APA review. Plaintiffs themselves never identified an example of a modified MPP they believed the Secretary should have considered; they merely argued that MPP should continue to be applied to at least some people. ROA.1131. But such an approach would not address the defects in MPP the Secretary identified.

The district court also erred by finding that the Secretary acted arbitrarily when he concluded that the high rate of in absentia removal orders under MPP raised concerns about MPP, without definitively establishing that those orders "resulted from aliens abandoning *meritorious* asylum claims." ROA.2957-59. The rate cited by the Secretary was merely one data point in his assessment of whether MPP afforded noncitizens a meaningful opportunity to seek asylum. The Secretary also found that MPP did not adequately "ensure that conditions in Mexico enabled migrants to attend their proceedings," which was supported by record evidence showing a substantially lower in absentia rate for non-MPP cases over the same

49

period. ROA.2343-46. The court's suggestion that the Secretary's concerns about the program's effectiveness and fairness were not a legitimate basis for his decision unless the Secretary achieved complete certainty is just the sort of demand for "empirical or statistical studies" that is not required by the APA, which "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus Radio*, 141 S. Ct. at 1160. Often "the available data does not settle a regulatory issue and the agency must then exercise its judgment." *State Farm*, 463 U.S. at 52. If, as here, "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).[12]

The district court's conclusion that the Secretary failed to consider Section 1225(b)'s supposed binary requirement to return noncitizens who are not detained, ROA.2959-60, is based on an erroneous legal premise. *See* p. 31-33, *supra*. Regardless, the Secretary considered "various options" "at [DHS's] disposal," "including detention, alternatives to detention, and case management programs" that "have been shown to be successful in promoting compliance with immigration requirements." ROA.1689; *see* ROA.1691-1829, 2229, 2246, 2252-58, 2358-59.

---

[12] The court also ruled it was arbitrary to consider COVID-related immigration court closures because courts had reopened, ROA.2959. But infrastructure used for MPP remains shuttered, ROA.2999, and given that the pandemic is ongoing and could continue to complicate the implementation of MPP, the Secretary's discussion of prior closures was entirely sensible.

Finally, even assuming the Secretary's reasoning was inadequate, the district court abused its discretion in vacating (and enjoining) the rescission memorandum rather than merely remanding without vacatur for additional explanation. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," and "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Even if this Court were to credit any of the district court's criticisms of the memorandum, "there is a serious possibility that [the Secretary] will be able to remedy [the supposed APA] failures," *id.*, on remand with a new decision and additional explanation. And remand without vacatur is particularly appropriate here, where vacatur could produce—and already has produced—"disruptive consequences," including to foreign policy. *Allied-Signal, Inc. v. United States NRC*, 988 F.2d 146, 150 (1993) (citation omitted). Because the district court's mandatory injunction causes "serious disruption[]," it is an abuse of discretion and should be vacated. *See Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); ROA.2985-3015.

The motions panel suggested that vacatur was warranted because any further explanation by the Secretary would amount to an impermissible "*post hoc* rationalization." *Texas*, 2021 WL 3674780, at *15. That reasoning would defeat the

very notion of remand without vacatur, contrary to a host of decisions by this Court and others. *See, e.g.*, *Texas Ass'n of Mfrs*., 989 F.3d at 389; *Allied-Signal*, 988 F.2d at 150. *Regents*, cited by the motions panel, specifically discussed the various options available on remand, and noted that "remand thus presented DHS with a choice: rest on the [prior] Memorandum while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons." *Regents*, 140 S. Ct. at 1908. The motions panel acknowledged that, at the very least, the latter option would be available to DHS on remand. *Texas*, 2021 WL 3674780, at *15.

Given the clear and myriad disruptive consequences caused by vacatur of the memorandum, the district court abused its discretion in not remanding without vacatur.

## V. Equitable Factors Do Not Support An Injunction.

The balance of equities also strongly weighs against an injunction that directs how the Secretary must exercise his discretion under the INA to enforce the immigration laws, improperly "invad[ing] a special province of the Executive." *AADC*, 525 U.S. at 489; *see Texas*, 2021 WL 4188102, at *6 (restricting "exercise of this historic discretion" over immigration enforcement "is irreparable in the basic sense of the word"). Further, because MPP requires the cooperation of Mexico, the injunction undermines the Executive Branch's constitutional and statutory authority and constitutes a major and "unwarranted judicial interference in the conduct of

foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013); *see Arizona*, 567 U.S. at 396 ("Some discretionary decisions [in the enforcement of immigration law] involve policy choices that bear on this Nation's international relations.").

MPP depended on returned individuals being able to reside temporarily in Mexico, which necessitated "close collaboration and negotiation with the Government of Mexico." ROA.2446. When first implemented, Mexico took "steps critical to [MPP's] functioning," including committing "personnel and infrastructure to receive individuals" and providing essential services. ROA.2991. DHS accordingly cannot restart MPP without significant cooperation from Mexico. Requiring DHS to re-implement MPP is thus tantamount to directing foreign policy, including with respect to delicate and ongoing discussions with Mexico that would be disrupted—and already are being disrupted—by this sudden change in course. ROA.2988-91; ROA.3008-14. The district court's statement that DHS can unilaterally reinstitute MPP and send non-Mexican nationals to Mexico without its agreement, ROA.2967 n.15, is both astonishing and refuted by the record.

As DHS Assistant Secretary David Shahoulian stated in a declaration, "implementation of MPP required close collaboration and negotiation with the Government of Mexico," and "requiring DHS to re-institute the program, would wreak havoc on the Administration's approach to managing migration in the region,

including by undermining … delicate bilateral (and multilateral) discussions." ROA.2447, 2452. Despite finding "David Shahoulian is a source[] whose accuracy cannot reasonably be questioned," ROA.2936 n.7 (quotation marks omitted), the district court gave no weight to these harms, concluding that DHS must "uphold *American* law," and "effects [on] foreign affairs" were thus irrelevant. ROA.2967. But foreign-policy implications are plainly relevant to the equitable calculation involved in granting or denying an injunction.

Requiring DHS to quickly restart MPP disrupts other initiatives DHS was implementing to manage migration and combat criminal networks by requiring diplomatic and DHS resources shift to restarting MPP. ROA.1689.[13] The use of MPP declined significantly during the last year of the prior administration, and much of the infrastructure required for MPP is no longer in place. Restarting it involves "significant and complicated burdens on border security personnel and resources," undermining other high-priority efforts and critically important DHS missions. ROA.1684-85, 1688-90; *see* ROA2270-71, 2449-50, 2991-93. This includes "new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19." ROA.2452-54. It thus causes

---

[13] That the injunction requires reinstituting MPP in "good faith" does not solve the problem. It still compels a profoundly disruptive shift of priorities, resources, and relations with Mexico, and does not provide "explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

massive disruption and implicates issues "intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).

These extraordinary and unprecedented harms dwarf those of the States, which submitted *no* evidence that they incurred any additional costs after MPP enrollments declined or ended, and made no showing that a nationwide injunction was necessary in addition to vacatur. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).[14] At the very least, the Court should vacate the portion of the injunction that precludes DHS from ending MPP unless and until it can detain all "aliens subject to … Section 1225 without releasing any aliens *because of* a lack of detention resources," and the associated onerous monthly reporting requirements. ROA.2970. The intrusion on Executive autonomy imposed by this condition is particularly acute given that the Executive cannot independently remediate the lack of detention capacity, but rather is dependent on Congress to do so. Because Congress has never appropriated sufficient funds to detain all noncitizens potentially subject to Section 1225, the injunction effectively requires DHS to maintain MPP in perpetuity even if the Secretary issues a new decision on remand that also addresses

---

[14] The motions panel also cited DHS's failure to follow the purported agreement with Texas as a basis for harm, *Texas*, 2021 WL 3674780, at *15, but as explained, the Secretary had already notified Texas that the agreement was void, and the district court held that the agreement was moot.

the issues the district court identified with the June 1 Memorandum. Any minimal harms the States may suffer could not possibly outweigh the serious and unprecedented intrusion on Executive authority wrought by an injunction mandating the *permanent* use of a discretionary immigration program that requires ongoing cooperation with a foreign nation.

## CONCLUSION

For these reasons, the Court should reverse the district court's decision and vacate the injunction.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

September 20, 2021

*/s/ Brian C. Ward*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

JOSEPH A. DARROW
*Trial Attorney*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Brian C. Ward*
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.1, it contains 12,999 words.

This brief complies with the typeface and the type style requirements of Fed. R. App. P. 35(a)(5)-(6), and Fifth Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Brian C. Ward*
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice